Bebuabd Weiss, J.
This action was tried before the court without a jury. Plaintiff seeks to recover $1,100 from defendant Citron for his failure to return a mink stole delivered to him for storage. She also seeks to hold the defendant insurance company for this loss under a Furrier’s Customers Policy issued to Citron. The complaint was amended at the trial to include a cause of action in conversion against Citron. That cause of action is hereby dismissed for failure of proof by reason of plaintiff’s default in complying with a conditional order of preclusion.
Aside from a general denial, Citron sets up a partial defense of a $100 limitation of liability in the storage receipt, and the insurance company sets up a partial defense of a limitation of liability in its policy to the amount stipulated in that receipt.
The issues relate to whether there is any liability for the loss, and, if so, the extent thereof by the respective defendants.
*709 About May 15, 1957, plaintiff received the stole as a gift, and on May 17 the same was appraised at $1,250. After she had worn the stole once or twice her husband, Jack Arkush, delivered the same for storage on July 17 to Citron, who was in the business of fur designing, repairs and storage.
After receiving an affirmative response to his inquiry as to whether the stole was insured, Citron issued his signed receipt, of which more later. The same bore on its face Citron’s handwritten figures of $100 in a column headed “ Depositor’s valuation, stipulated to be furrier’s limit of liability, irrespective of value,” and $5 in an adjoining column headed “ Storage And Service Charges Charges are based on value declared,” which charge Arkush thereupon paid. There is some dispute as to the accompanying conversation. Arkush testified that he merely glanced at both sides of the receipt and noticed the $100 figure, without being advised or conscious of its significance. Citron testified that he mentioned the valuation, as well as the charge, to Arkush. At any rate, Citron admittedly did not call the attention of Arkush to any of the other provisions of the receipt, and the latter admittedly did not read or examine the same then or thereafter.
That same day Citron, whose premises were on the eighth floor of 352 Seventh Avenue, Manhattan, placed the stole in , the vault of a friend in the building for safekeeping overnight because of the absence of a vault or any means of safeguarding garments in his own premises. The door to his premises, which opened into the public hallway, was equipped with two locks, one a snap lock and the other requiring the manual use of a key to be locked from the outside. Citron testified that only he had the keys. No testimony was adduced as to whether the building provided its tenants with the customary cleaning service at night, entailing the use of passkeys by its employees. Two windows in the rear of the premises were equipped with common garden variety center locks, but had no blinds or bars, and there was a fire escape about five feet from the further side of one window. The premises were not provided with an alarm system nor were the same wired or otherwise protected against entry, except as above described.
The following afternoon, July 18, Citron returned the stole to his own premises and put the same on a table preparatory to pinning a ticket thereon for storage in a warehouse. This table was set lengthwise against the rear wall between the two windows and extended fully or partly under each window. There were no other furs in the premises and Citron was alone at the time.
*710 Citron testified that he was suddenly seized with stomach cramps, shut the snap lock on the door and went to the men’s lavatory two doors down the hall, leaving the other door lock open and the windows unlocked and open from the top about three-quarters down; and that the condition of the windows was such that the upper windows jammed and could not be lowered further. He returned in 5 or 10 minutes and the stole was gone. The windows were still in the same position and he could discover no marks of entry on the door or windows. He notified Arkush of the loss on the same day, and on July 24 reported to the defendant insurance company that the garment had been stolen. Plaintiff received $1,100 in settlement from her own carrier and this action is in the nature of subrogation.
Citron was a bailee for hire and had the obligation of due care. While the burden of proving negligence may rest upon plaintiff, the failure of the bailee to return the subject property establishes negligence prima facie and requires an exonerating explanation from the bailee. Upon this principle the parties and the numerous authorities cited by them agree (e.g., Fidelity & Guar. Ins. Corp. v. Ballon, 280 App. Div. 373; Claflin v. Meyer, 75 N. Y. 260).
Defendants assert that the mere disappearance of the article from Citron’s locked premises presupposes a theft, thereby satisfying his burden of explanation and restoring to plaintiff the full burden of proof of negligence. This, however, is dependent upon the preliminary adequacy of Citron’s explanation. In Fidelity S Guar. Ins. Corp. v. Ballon (280 App. Div. 373, supra) the Appellate Division of this department, upon abundant authority, held: “ Where, as here, there is proof that the property was delivered to the bailee and was not returned, it becomes his duty to show the surrounding circumstances of the loss. It places upon the bailee the necessity of explaining how he cared for the bailed property and why he cannot return it ” (p. 376).
The necessary extent of this explanation was defined by Cabdozo, J., in Honig v. Riley (244 N. Y. 105, 110): “ the inference [of negligence] may be repelled through proof by the bailee that the thing, though not returned, has been lost without his fault (Claflin v. Meyer, 75 N. Y. 260).”
Assuming Citron’s credibility, the court finds him guilty of negligence in leaving no more than a snap lock between this valuable garment and a felon, and in failing to apply the window and manual door locks against intrusion. In the absence of any recognized safeguards on his premises for articles of such value, of which he was aware when he previously *711 placed the stole in the vault of another for safekeeping, it was his duty to utilize all the limited means with which his premises were equipped before leaving the garment unattended. And, if the exigencies of his physical condition did not allow him the time to do so, he had the alternative duty and opportunity of taking this easily portable article with him when he left the premises.
Actually, Citron’s explanation lacks credibility. That the windows of his premises, which were without cross ventilation, were in such a state that the same could not be fully opened in midsummer, and that some prescient intruder anticipated this isolated moment to abstract this sole article of value from the premises would challenge the most credulous. The court is reluctantly constrained to express its disbelief in Citron’s testimony.
We, therefore, proceed to a determination of the issues raised by the limitations of liability asserted by the defendants. The receipt issued by Citron is prominently captioned on its face and reverse sides as a “ Storage And Service Agreement.” It is then introduced on its face by the boldly capitalized legend:
‘ ‘ THIS RECEIPT IS A STORAGE CONTRACT. ARTICLES LISTED BELOW ARE ACCEPTED POR STORAGE UNTIL DEC. 31, 1957, SUBJECT TO THE TERMS AND CONDITIONS ON BOTH THE PACE AND BACK HEREOF. IN ACCEPTING THIS RECEIPT, THE DEPOSITOR AGREES TO BE BOUND BY ALL OP ITS TERMS AND CONDITIONS AND ACKNOWLEDGES THAT THIS RECEIPT IS THE ENTIRE AGREEMENT WITH THE FURRIER, WHICH CANNOT BE CHANGED EXCEPT BY ENDORSEMENT HEREON SIGNED BY THE FURRIER. ’ ’
This is followed by five vertical columns respectively headed as follows:
“No. Op Articles Description Op Article Condition
(Not noted unless described below)
Depositor’s valuation, stipulated to be furrier’s limit of liability irrespective of actual value Storage and Service Charges Charges are based on value declared
Be it noted that the portions of these headings in lower case are in fine print. In the lower right corner above Citron’s signature appears the following in fine print: “ Our liability for loss or damage from any cause whatsoever, including our own negligence or that of employees and others, is limited to the declared valuation as it appears in the valuation column,”
*712 In the lower left is a breakdown of the charges in prominent italics as follows :

“ Repairing or Remodeling Gleaning é Glazing Storage Charge Total Charges

$
$
$5.00
$5.00”.
In the extreme lower left corner appears a prominent figure in the form of a- seal bearing the boldly capitalized words, “ Storage Agreement Receipt.” In the upper left corner there appears in fine print a requirement, in substance, that the depositor notify the furrier of any objections within 10 days. This provision is academic, since the loss occurred the day after the issuance of the receipt.
It may be difficult to convey or visualize the face of this instrument by description. To the lay eye the same would represent a receipt, conspicuously featured as such. By contrast, all else, including the provisions upon which the limitation of liability is predicated, is obscure, obviously by design.
The reverse side of the instrument is boldly headed “ Terms And Conditions ’ ’ in large capitals, beneath which is the following subhead in considerably finer print: ‘1 There shall he no liability for loss or damage to the articles deposited resulting directly or indirectly from any cause whatsoever, including the negligence of the undersigned, or anyone else, beyond the valuation specified on the face of this receipt.”
Then follow some 15 paragraphs of terms and conditions, including several implementing the limitation of liability, in print so fine and so closely spaced as to discourage examination by the customer.
The likelihood of the customer’s perusal and comprehension of such an instrument in snch a transaction being unrealistic, we are called upon to construe its legal effect in the face of a record barren of any declaration of value by plaintiff or any offer of alternative rates or notice of the provisions of the instrument by Citron, except for a passing mention of the $100 figure and the $5 charge, which the court holds to be insufficient. (Howard v. Handler Bros. & Winell, 279 App. Div. 72, 74, infra.)
The plaintiff relies on cases which invalidated certain limitations of liability in instruments of this character, particularly with respect to the bailee’s negligence, on the ground of the insufficiency of the exculpatory language (e.g., Rappaport v. Phil Gottlieb-Sattler, Inc., 280 App. Div. 424, affd. 305 N. Y. 594; Howard v. Handler Bros. & Winell, 279 App. Div. 72, affd. 303 N. Y. 990). The defendants seek to differentiate the *713 present instrument from those there under scrutiny on the ground that this instrument contains language curing the infirmities upon which those receipts foundered. This, in the opinion of the court, does not resolve the current issue. This case is, rather, governed by the principle enunciated in Rappaport v. Storfer Bros. (2 Misc 2d 395) in which the Appellate Term of this department held: “ Since the [limitation] clause in this receipt appears in fine print in the midst of much verbiage and involved legal phraseology, the furrier had the burden of proving that plaintiff received actual notice of such limitation or was aware of it ” (p. 396).
We have already stated that, except for a passing mention of the $100 figure and the $5 charge, plaintiff neither received notice nor was aware of the limitation. In a review of analogous testimony in Howard v. Handler Bros. & Winell (279 App. Div. 72, supra) Peck, P. J., stated: “Plaintiff testified that she regarded this document as merely a receipt, and although she saw that a valuation of $1 was written into the document, she did not read the document, regard it as a contract, or know the purported limitations of liability contained therein. On the factual issue, which was left to the jury, a finding was evidently made in plaintiff’s favor ” (p. 74).
On a similar issue, this court has made a finding in plaintiff’s favor.
It is true that in the Howard case (supra) the insufficiency of the exculpatory language, rather than the quoted finding, was the basis of decision. However, the finding becomes relevant in the context of Rappaport v. Storfer Bros (supra) wherein the determining factor was that of notice. This is pointed up by the description of the receipt in the opinion of Baer, J., at the conclusion of the first trial in the Rappaport case (207 Misc. 391): “ In my opinion the printed provisions of the receipt in the case at bar are, by themselves, not sufficient to limit liability. The front of the paper is clearly called a ‘ Cold Storage Beceipt", and there is only slight reference to inclusion of the limitation of liability clauses which appear in small print on the reverse side of the receipt. This paper by itself can only be construed as a receipt identifying the stored chattel. If this was the only issue for determination the court would be justified in directing a verdict for the plaintiff on this issue ” (p. 395).
This court has already found that the instrument in suit was conspicuously held out as a receipt, its other provisions designedly hidden behind that facade. This format was hardly necessary had the same not been intended as a trap for the uninitiated *714 and the unwary. Although justice is concerned with substance rather than form, in this instance form is a matter of substance.
The court therefore finds against the defendant Citron on the limitation of liability in the receipt, as well as on the issue of negligence. From the expert testimony of plaintiff’s appraiser the court is satisfied that this stole was of the value of $1,250 on May 17, 1957, the date of appraisal, and on July 17, 1957, the date of bailment. The court therefore holds that plaintiff is entitled to judgment against defendant Citron in the amount of $1,100 in suit, with interest.
The liability of the defendant insurance company to plaintiff depends on the basic policy it issued to Citron and an “ Excess Legal Liability Endorsement ” attached thereto.
The policy insures ‘ ‘ Against all risks of loss of or damage to the insured property, including the named insured’s legal liability therefor, except as hereinafter provided.” However, the policy further provides that, “ The Company shall not be liable for more than the amount stipulated in the named Insured’s receipt as applying to each article, whether on account of legal liability or otherwise”. It also lays down conditions to be, and which were, incorporated in the customer’s receipt, among other things that:
“ (b) the named Insured will have effected for the benefit of the customer insurance on each article listed in the receipt which shall, in terms usual to such insurance, cover against loss by fire and theft for the value set opposite each item, which value shall also be stated to be the limit of the nam.ed Insured’s liability for any loss or damage to said article;
“ (c) the provisions of the receipt shall inure to the benefit of the Company to the same extent that they were to the benefit of the named Insured.”
The indorsement requires the company “ To pay on behalf of the Insured all sums which the Insured shall become obligated as a bailee to pay by reason of the liability imposed upon the Insured by law for damages because of direct loss of or damage to the property insured under the policy to which this endorsement is attached and for which the Insured issued a receipt complying with the provisions of the policy, but this agreement to pay shall apply only to the amount of such liability in excess of the valuation entered in said receipt, and shall be subject to the limits of liability hereafter stated.”
The insurance company concedes its liability to plaintiff to the extent of $100 under the basic policy if Citron is found to have been negligent. It disputes any liability to plaintiff under the excess legal liability indorsement on the ground that only *715 the bailee, not the customer, may maintain an action thereon, citing Zayenda v. Spain & Spain, Ltd. (201 Misc. 963, affd. 280 App. Div. 752, motion for leave to appeal or reargument denied 280 App. Div. 861). In that case, however the Appellate Division of this department sustained a judgment for the carrier only for the reason that: ‘ ‘ Plaintiff was not accorded the protection of that insurance for a transaction outside the scope of such bailment, to which she consented ” (280 App. Div. 752).
No such issue arises here. This case is, instead, controlled by the decision in Rappaport v. Phil Gottlieb-Sattler, Inc. (280 App. Div. 424, supra, affd. 305 N. Y. 594) in which the same court held at page 427: “As to the right of plaintiff against defendant insurance company on the excess legal liability indorsement, it is to be noted that the undertaking of the insurance company is to pay ‘ on behalf of the assured ’ all sums which the assured shall become obligated as a bailee to pay to a customer for damage because of loss of property. While the insurance company would be under no greater liability to the customer than the assured, and any defense which it might have to a claim over by its assured could be availed of to defeat liability to the customer, it is acknowledged here that the insurance company will be liable to the assured for whatever its liability may be to plaintiff. In that situation, under the agreement to pay on behalf of the assured all sums for which it is liable, plaintiff may recover directly on the policy.”
Plaintiff is also entitled to judgment against the defendant insurance company in the amount of $1,100, with interest.
Defendant’s motions to dismiss at the close of plaintiff’s case and at the end of the entire case, on which decision was reserved, are denied. Judgment for the plaintiff against the defendants in the sum of $1,100, with interest. Ten days’ stay.