Isidore LIPSCHUTZ, d/b/a Lipschutz & Gutwirth Co., Plaintiff,

v.

GORDON JEWELRY CORPORATION and Linz Bros., Inc., Defendants.

Civ. A. No. 70–H–649.

United States District Court,
S. D. Texas,
Houston Division.

Feb. 22, 1974.

Arthur I. Winard, New York City, M. Michael Gordon, Houston, Tex., for plaintiff.

Charles Crady, III, Childress, Port & Crady, Houston, Tex., for defendants.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

Before the Court is plaintiff's second motion for summary judgment, plaintiff's first motion having been denied on February 5, 1971. As a result of substantial discovery having been undertaken since 1971, this Court is now satisfied that there no longer exists a real controversy as to a material fact. Accordingly, plaintiff's motion is granted.

Plaintiff is a wholesale diamond dealer doing business in New York City. The defendant Gordon Jewelry Corporation (Gordon's) is a Delaware Corporation, with its principal offices and place of business in Texas. The defendant Linz Bros., Inc., (Linz) is a Texas corporation doing business in Dallas, Texas, and is a subsidiary of Gordon's, both defendants being retail diamond and jewelry merchants. Prior to January 10, 1970, the plaintiff forwarded various items of jewelry to Linz, each accompanied by an "all-risk" memorandum described more fully below. In January, 1970, there was a robbery at Linz of approximately $1.5 million of merchandise

(retail value), of which more than $700,000 was on consignment from wholesale dealers, the remaining being merchandise owned outright by Gordon's and/or Linz. There was insufficient insurance to cover all losses fully, as the actual cost of Linz owned jewelry plus the asking or memorandum price of consignment jewelry exceeded the approximately $1,000,000 of insurance coverage.

The stolen items of jewelry were selected from the plaintiff's stock in New York City and sent by registered mail to Linz. More specifically, of the approximately 19 instances in which such selections were made, some were chosen by a representative of Linz while personally present in New York City and then shipped by the plaintiff to Dallas, Texas; the majority of the selections, however, were made by the plaintiff's employees in response to telephone requests by Linz's representatives in Dallas, the merchandise then being sent in the manner described above. Regardless of which procedure was utilized in selecting the merchandise, the items were covered by accompanying all-risk memoranda, the scope and effect of which are at issue. Each memorandum contains the following printed recitations:

> Received on consignment from Lipschutz & Gutwirth Co., 630 Fifth Avenue, New York City, the following goods, pursuant to the following agreement:
>
> The goods described and valued as below are delivered to undersigned *Linz Bros.* for examination, remaining your property and subject to your order, and shall be at once returned to you on demand. The undersigned assumes full and unqualified responsibility for the absolute return of the said property, or the cash proceeds to you on demand, without any excuse or defense whatsoever. The goods will be considered sold only when cash payment has been forwarded to you.

Copies of the memoranda, signed by Linz, were returned to the plaintiff. The plaintiff contends that the mailing by the plaintiff in New York of the diamonds and jewelry, subject to the memoranda, was the last act required to be done to make the consignment agreement, that is, the All-Risk Memorandum, effective. The plaintiff further asserts that, the contract having been made in New York, New York law should apply which in its opinion compels the conclusion that the recitations in each memorandum constitute the whole contract between the plaintiff and Linz, that such recitations are unambiguous and that pursuant to their terms judgment in favor of the plaintiff is required as a matter of law. Green v. Wachs, 254 N.Y. 437, 173 N.E. 575 (1930). Plaintiff also contends that Gordon's is liable upon its representation to the trade in general, and the plaintiff in particular, that it would be responsible for all diamonds and jewelry sent to its subsidiary Linz, a representation upon which the plaintiff relied.

Aside from Gordon's denial of any liability for the loss incurred by its subsidiary, the defendants jointly contend: (1) that the recitations contained in each memorandum do not constitute the entire contract between the parties, there existing numerous trade customs and usages which vary the above terms, (2) that there exists a trade custom or usage in cases wherein all-risk memorandum merchandise is lost or stolen and there is insufficient insurance whereby a consignee suffering the loss or theft is liable only for the consignor's actual cost plus 5 percent, and alternatively, (3) that the consignment was, in fact, a bailment for the mutual benefit of plaintiff and Linz; thus, there is no liability, since the theft or robbery was not caused in any way by the negligence or misconduct of Linz.

Since this Court's denial of plaintiff's first motion for summary judgment in 1971, plaintiff has engaged in extensive and far reaching discovery in an effort

to determine what trade practices and usages exist in the diamond industry with respect to all-risk memoranda as well as to discover facts surrounding this particular loss. Oral depositions were taken which focused substantially upon the litigants, their employees and those persons who presumably had knowledge of the trade practices upon which the defendants rely.[1] Of particular interest to this Court are the responses made by witnesses to depositions upon written questions undertaken by the plaintiff following notice to opposing counsel as required by Fed.R. Civ.P. 31. Such inquiries were submitted to responsible officers of major associations of diamond wholesalers, manufacturers and retailers around the world, and evidently include representatives in each major diamond market.[2] Similar questions were aimed at establishing the practices in the United States and at demonstrating that the customs were virtually identical.[3]

*Trade Customs in the Diamond Industry*

The diamond trade in the United States is primarily centered in a small geographical area in the City of New York. It is alleged by the plaintiff, reasonably supported in the record, and undenied by the defendants, that 99 percent of the wholesale diamond dealers in the United States are located in a six-block area in New York City. Under such conditions trade practices have tended to become relatively fixed and certain. This Court has studied the voluminous documents comprising the record and finds that definite trade customs do exist in the diamond industry and that they are substantially identical to those described in the affidavit of Albert Linz Hirsch in support of defendant Linz's opposition to the plaintiff's

1. Oral depositions were taken of the following persons: (1) Isidore Lipschutz, the plaintiff [Court Document No. 58]; (2) Alvin Benjamin, employee of plaintiff engaged in sales and merchandise shipment [Court Document No. 56]; (3) Albert Linz Hirsch, president of defendant Linz Bros., Inc. [Court Document No. 96]; (4) Carl Ericson, employee of defendant Linz Bros. as supervisor of the diamond receiving department [Court Document No. 94]; (5) Aron F. Gordon, executive vice president, treasurer and director of defendant Gordon's Jewelry Corporation [Court Document No. 95]; (6) Robert M. Gordon, officer of Gordon Excess Coverage, Ltd., an insurance company primarily doing business for jewelers who carried Linz Bros.' policies [Court Document No. 60]; (7) Milton T. Adler, president of Coleman E. Adler and Sons, Inc., of New Orleans, Louisiana, which firm suffered a jewelry loss under similar circumstances and upon which defendants rely in part [Court Document No. 101]; (8) Irving Getz, president of Mayor's Jewelers of Miami, Florida, which firm also suffered a loss upon which defendants rely in part [Court Document No. 106]; and (9) Mario Montekio, a self-employed diamond broker who also suffered a loss with defendants, but had subsequently settled [Court Document No. 103].

2. Depositions upon written questions were taken of the following persons: (1) J. Nutkewitz, president, Beurs Voors Diamanthandel, Antwerp, Belgium [Court Document No. 74]; (2) Sylvain P. Zucker, president, Diamantclub van Antwerpin, Antwerp, Belgium [Court Document No. 71]; (3) L. Abrams, immediate past chairman, Diamond Club of South Africa, Union of South Africa [Court Document No. 76]; (4) J. Nutkewitz, president, Federatie der Belgische Diamantbeurzen, Antwerp, Belgium [Court Document No. 73]; (5) Jules Lewis, president, International Diamond Manufacturers Association, Antwerp, Belgium [Court. Document No. 79]; (6) E. Goldstein, Chairman, The London Diamond Club, Ltd., London, England [Court Document No. 83]; and (7) Leo Breugelmans, president, Vrije Diamanthalden, N.V., Antwerp, Belgium [Court Document No. 80].

3. Depositions upon written questions were taken of the following persons: (1) Stephen S. Korngold, president, Diamond Dealers Club, Inc., New York City [Court Document No. 48]; (2) Robert Kaleko, president, Diamond Manufacturers and Importers Association of America, Inc., New York City [Court Document No. 46]; (3) William Nelkin, wholesale diamond dealer and manufacturer, for 49 years, New York City [Court Document No. 47]; (4) Joseph Baumgold, diamond manufacturer and importer for 45 years, New York City [Court Document No. 45]; and (5) Robert M. Gordon, officer of Gordon Excess Coverage, Ltd., the same individual who subsequently submitted to oral deposition above [Court Document No. 49].

first motion for summary judgment. The record does reflect that on occasion jewelry is delivered under circumstances other than those utilizing an accompanying all-risk memorandum. However, such an instance has no relevance to the present litigation. In order that this case may be viewed in proper perspective, the following summary of the evidence in this case capsules the usual custom and practice in the diamond industry, nationally and internationally, with respect to consignment deliveries of diamonds and jewelry upon all-risk memoranda from wholesalers to retail merchants:

(a) Retail merchants will inquire of wholesale dealers, either in person, through an agent, or by telephone, whether the dealer has specific types of jewelry or diamonds within given price ranges; not infrequently, wholesale dealers will call upon merchants, in person, by agent, or by telephone, to advise that certain items within given price ranges are available.

(b) Regardless of who initiates the negotiations, if the retail merchant feels that he has a market for one or more of the items of jewelry offered by the wholesale dealer, he will select such item or items. If done in person with the stock available for inspection, the retail merchant makes the selection. If done by telephone, the wholesale dealer makes the selection as best he can to meet the retailer's specifications. In either case, the wholesale dealer mails the selection or otherwise delivers it to the retailer.

(c) The item or items of jewelry selected are delivered to the retail merchant accompanied by a memorandum. This document, identified generally as an "all-risk" memorandum, contains pre-printed information and blank spaces for the insertion of the date, the consignee and the items of merchandise delivered. The pre-printed language is not standardized, but the all-risk provision generally states that:

(i) the item or items of jewelry accompanying the memorandum are de-livered to the retail merchant solely for the purpose of inspection by the retail merchant and prospective purchasers of such jewelry,

(ii) title to each item is retained by the wholesale dealer,

(iii) the retail merchant may not sell any item accompanying the memorandum without the prior written consent of the wholesale dealer,

(iv) the retail merchant assumes all risk and hazard with respect to the item or items of jewelry,

and occasionally there is the added provision that:

(v) the memorandum constitutes the entire agreement between the wholesale dealer and the retail merchant.

The wholesale dealer inserts on this form the name of the retail merchant, an itemized description of the jewelry accompanying the memorandum and the wholesale dealer's asking price or value. The retail merchant signs a copy of the memorandum and returns it to the wholesaler. [This satisfies the requirements of the Statute of Frauds. *See* Uniform Commercial Code § 2–201.]

(d) Upon receipt of items of jewelry accompanied by memorandum, the retail merchant or his agent will inspect such items of jewelry and:

(i) if all or a portion of such jewelry does not meet the representations of the wholesale dealer or expectations of the retailer with respect to quality and price, return such portion promptly to the wholesale dealer, or

(ii) if several items of a specific type of jewelry have been forwarded to the retail merchant, such as three or four pairs, of earrings, the retail merchant will select those pairs of earrings that appear to be the most saleable in his retail store and promptly return the remainder to the wholesale merchant. [This practice generally comports with Uniform Commercial Code § 2–513.]

(e) The items of jewelry retained by the retail merchant after delivery will be placed in the retail merchant's showcas-

es for sale at a price determined by the retail merchant, subject to the right of the retail merchant to return such jewelry to the wholesale dealer at any time without notice and subject to the right of the wholesale dealer to demand the return of such jewelry from the retail merchant at any time without notice. Occasionally, but apparently infrequently, an item or items may be sent from one retail merchant directly to another retail merchant. This may occur when both retail merchants are subsidiaries of a parent corporation, or when a wholesale dealer has specifically requested that it be done. A new memorandum is then issued by the wholesaler to the new consignee. Otherwise, the general rule is that items are returned to the wholesale dealer and then sent directly to the new retailer with a new memorandum.

(f) When an item or items of jewelry have been selected by a retail merchant and placed in its showcases for sale, it is customary in the trade that, notwithstanding the provisions of the memorandum as set forth in (c)(iii) above, the retail merchant may sell any such item of consigned jewelry in the ordinary course of business without prior notice to the wholesale dealer. [This comports with Uniform Commercial Code §§ 2–326, 2–403.] The retail merchant usually sets a retail sales price for each item sufficient to yield the wholesale dealer's asking price plus the profit desired by the retail merchant. Occasionally, a prospective purchaser may wish to purchase an item at a price which is lower than that assigned by the retail merchant. If the merchant is of the opinion that the prospective purchaser is in good faith and is ready, willing and able to buy such item of jewelry, the merchant may seek to obtain a reduction in the wholesale dealer's asking price so as not to eliminate all of the retailer's profit. This transaction is generally accomplished by telephone, and reductions are occasionally given.

(g) A wholesale dealer supplying jewelry may unilaterally increase the asking price of any item of jewelry already in the possession of a retail merchant at any time. This is generally done in writing. Any item for which an increase is directed and which was sold prior to the receipt of the dealer's instructions remains subject to the original asking price. The retail merchant generally will give notice to the wholesale dealer in writing as to which items were sold based upon the original memorandum and advise that unsold items are being held subject to the increase. [This practice comports with Uniform Commercial Code § 2–209.]

### Trade Custom With Respect to Loss and Liability

With respect to the use of memoranda in connection with liability for loss, it is the common practice in the diamond industry that all-risk memoranda be used. Consequently, retail merchants are likely at any given time to be carrying a large stock of all-risk memorandum merchandise on consignment from one or more wholesale dealers. More critically, with the exception of the claims of the defendants as set forth in their amended pleadings, the substance of the written and oral depositions uniformly points to a trade custom and usage whereby a retailer consignee would be liable to the wholesaler consignor for "all risks" to consignment items delivered with all-risk memoranda while they were in the possession of the consignee. The extent of consignee liability is the monetary value of the items as listed on the memorandum or its increased value if changed subsequently by the consignor. In fact, the proof indicates that the majority of the international diamond associations have a policy of suspending or excluding members for non-payment of the value set forth on the memorandum. The defendants' claim of the existence of a trade practice that in case of theft a consignee who is underinsured is responsible only for the consignor's actual cost plus a small percentage finds no support whatsoever in the evidence.

The record contains references to a variety of memorandum jewelry losses by consignees. A few resulted in settlements upon figures lower than the memorandum price, while most were paid in full.[4] Particular reliance is placed by the defendants upon three loss situations. The defendants note that of 31 consignors whose merchandise was stolen at Linz Bros., Inc., at the same time as plaintiff's, all except a total of six (including plaintiff) were paid amounts in satisfaction of their claims which were 20–25 percent less than original memorandum prices. Mr. Gordon characterized these as "negotiated settlements" which were "fair".[5] The second situation involved a loss suffered by Coleman E. Adler & Sons, Inc., of New Orleans, Louisiana, in 1966, wherein two major consignors accepted reimbursement at a value substantially below the stated memorandum value. However, Milton Adler, president of the consignee, stated that while he was appreciative of the discounts, he nevertheless believed he was indebted to pay whatever price the consignors wanted.[6] Mr. Adler did not "demand" a settlement, but requested that consideration of a "concession" be made.[7] The third situation involved a 1969 loss by Mayor's Jewelers of Miami, Florida, wherein similar discounts were received by consignors. When notifying consignors of the loss by mail, Mayor's Jewelers informed them that it had been advised by its attorney that its legal liability was limited to paying only the consignor's actual cost. The letter included an approximation of that amount, included a check for 75 percent of that figure and included a clause

wherein the consignor agreed to settle for that amount.[8] Nevertheless, Mr. Getz, president of Mayor's Jewelers, stated that he did not "demand" or "insist" upon the reduction, but requested leniency.[9] He felt that he had a moral and business obligation to pay his consignors the full amount under the memorandum if they refused to accede to his discount request.[10]

## Insurance Negotiations

The record also clearly reflects that the plaintiff relied to his detriment upon the representations of defendant Gordon's concerning insurance coverage of memorandum merchandise. On June 10, 1965, the plaintiff wrote Gordon's and stated, in pertinent part:

> As you know, all of the merchandise which is entrusted to you by us, is delivered to you pursuant to the terms of the usual "at risk" memorandum. We wish to remind you that in these circumstances you are fully responsible for the merchandise which is at your risk from all hazards until this merchandise is physically returned into our possession.[11]

On June 23, 1965, Gordon's replied that "[e]ffective May 5, 1965, some changes were made in the insurance coverage during transportation of memorandum merchandise shipped by your firm to Gordon Jewelry Corporation or any Gordon subsidiary company. These subsidiary companies are: 1. . . . (d) Linz Jewelers, Dallas, Texas." The changes were summarized as follows:

> (1) On any merchandise shipped from your firm to Gordon Jewelry Corpora-

4. For example, see the following: (1) Deposition of Isidore Lipschutz, *supra* note 1, at pp. 53–58; (2) Deposition of Albert Hirsch, *supra* note 1, pp. 33–36, 38–39; (3) Deposition of Aron F. Gordon, *supra* note 1, at pp. 92–94, 109; (4) Deposition of Mario Montekio, *supra* note 1, at pp. 22, 31.

5. Deposition of Aron F. Gordon, *supra* note 1, at p. 109.

6. Deposition of Milton Adler, *supra* note 1, at 57.

7. *Id.* at 72.

8. Deposition of Irving Getz, *supra* note 1, at 22–23 and Defendants' Exhibit 8B.

9. *Id.* at 25.

10. *Id.* at 34–35.

11. *See* Lipschutz v. Gordon Record on Appeal, Vol. 1, Original Papers—Instruments Nos. 1 through 8, at Instrument No. 8, Exhibit E.

tion or any of its subsidiary companies you must be completely responsible for the insurance coverage until the merchandise is received at its destination.

(2) When merchandise is returned to your firm by Gordon Jewelry Corporation or any of its subsidiary companies you must be completely responsible for the insurance coverage from the time the merchandise leaves our control until it is received by your firm.

(3) Only while the merchandise is in the possession of Gordon Jewelry Corporation or any of its subsidiary companies does our insurance company provide any insurance coverage.[12]

The plaintiff subsequently replied:

Pursuant to our pleasant telephone conversation, I am glad to inform you that we have coverage for the shipment to you and for the return shipment to us by registered airmail, but that we have no coverage while the goods are in your possession.

Consequently, as long as the goods are in your possession, you are fully responsible for them.[13]

It may be noted that the parties expressly agreed to modify the otherwise controlling provision of Uniform Commercial Code § 2–327(2)(b) which absent such agreement provides that return of the goods is at the buyer's risk and expense. *See also* U.C.C. § 2–509(1)(b). Such negotiations concerning insurance are appropriate. *See* Uniform Commercial Code § 2–501.

### *Propriety of Summary Judgment*

■ Federal Rules of Civil Procedure 56(c) provides that summary judgment as a matter of law shall be rendered forthwith:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact

. . . .

*See* Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Whitaker v. Coleman, 115 F.2d 305 (5th Cir. 1940); 6 J. Moore, Federal Practice ¶ 56.15 (2d ed. 1948, recompiled 1965). It is not lightly to be granted and is not to be a substitute for the trial of disputed issues of fact. United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed. 2d 176 (1962); DeBardeleben v. Cummings, 453 F.2d 320, 324 (5th Cir. 1972); Brunswick Corp. v. Vineberg, 370 F.2d 605, 612 (5th Cir. 1967); Heyward v. Public Housing Administration, 238 F.2d 689 (5th Cir. 1957); American Ins. Co. v. Gentile Bros. Co., 109 F.2d 732 (5th Cir. 1940), cert. denied, 310 U. S. 633, 60 S.Ct. 1075, 84 L.Ed. 1403 (1941). Its use is limited to that exceptional situation where " 'there is no genuine issue as to any material fact' and . . . 'the moving party [is] entitled to a judgment as a matter of law' ". Shahid v. Gulf Power Co., 291 F.2d 422, 423, rehearing denied, 298 F.2d 793 (5th Cir. 1961). A genuine issue is one which can be maintained by substantial evidence. Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co., 149 F.2d 359, 362 (5th Cir. 1945); Polly Chin Sugai v. General Motors Corp., 137 F.Supp. 696 (D.Idaho 1956).

■ Turning to the facts in this record, there is no evidence to support the defendants' contention that a trade custom exists with respect to reduced consignee liability under circumstances in which there is a loss and the consignee has insufficient insurance to make payment in full. To the contrary, the custom fully supports the plaintiff's position. There is evidence that settlements occur and that the settlements often are, in fact, for a figure less than the memorandum price. Such settle-

12. *Id.* at Exhibit D.

13. Letter of June 6, 1966. *Id.* at Exhibit F. *See also* affidavit of Isidore Lipschutz, to which this exhibit is attached, at pages 15–16.

ments also serve to avoid litigation, protracted periods of waiting before payment and other such costly factors. However, if such a practice has evolved as a fixed custom in the industry, as defendants contend, it has not been demonstrated in the proof adduced in this case. Had such been shown, it would nevertheless be inadmissible as violative of the parole evidence rule as set out later in this opinion. The Court has also noted that the defendants submitted no written questions upon oral deposition, either to those persons questioned by the plaintiff or to others. Similarly, counsel for the defendants specifically declined to ask questions of some witnesses upon oral deposition, stating that questioning would be postponed until the time of trial. This occurred with respect to witness Linz,[14] witness Aron F. Gordon [15] and witness Carl Ericson.[16] A party opposing a motion for summary judgment is not entitled to hold back his evidence, if any, until the time of trial. Bruce Construction Corp. v. United States for use of Westinghouse Elec. Supply Co., 242 F.2d 873, 874 (5th Cir. 1957); Wilkinson v. Powell, 149 F.2d 335, 337 (5th Cir. 1945); Franks v. Land Marine Applicators, Inc., 347 F.Supp. 243 (E.D. La.1972); 6 J. Moore, Federal Practice ¶¶ 56.11[3], 56.15[3], 56.24 (2d ed. 1948, recompiled 1965).

A court should give due weight to a number of factors in evaluating a motion for summary judgment. These include the need for cross-examination by the opposing party in relation to evidentiary materials, the general desirability of demeanor testimony, the factor of access to proof by the opposing party and the desirability that the case receive the full exploration of a trial. *See* 6 Moore, *supra*, ¶ 56.25 at 2856. Considering the full record and the foregoing legal principles, this Court finds this case to be ripe for summary judgment.

## Conflict of Laws Resolution

A federal court sitting in a diversity case must follow the Conflict of Laws rules prevailing in the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Wright v. Standard Oil Co., Inc., 470 F.2d 1280 (5th Cir. 1972). Under Texas Conflict of Laws rules, the effect of a contract is to be determined by the law intended by the parties to control, and in the absence of a contrary manifestation, the presumption is that the parties contract with reference to where the contract was made, this generally being the place where the offer is accepted. Dailey v. Transitron Electronic Corp., 475 F.2d 12, 14 (5th Cir. 1973); Diaz v. Southeastern Drilling Co. of Argentina, S.A., 324 F.Supp. 1, 4 (S.D.Tex.1969), aff'd, 449 F.2d 258 (5th Cir. 1971); Austin Building Co. v. National Union Fire Ins. Co., 432 S.W.2d 697, 701 (Tex.Sup.Ct. 1968); Hatchett v. Williams, 437 S.W.2d 334, 338 (Tex.Civ.App.—Houston 1968, writ ref'd n. r. e.), cert. denied, 396 U.S. 963, 90 S.Ct. 437, 24 L.Ed.2d 427 (1969). From the facts as revealed in this case, it is this Court's determination that Texas courts would find that the parties intended New York law to apply or, alternatively, that New York law would apply as a matter of Conflict of Laws resolution. This conclusion may be based upon a variety of legal approaches, including but not limited to the following.

In all cases here pertinent, the "offer" to contract was made by Linz through its order or request that diamonds and jewelry be delivered on consignment by the plaintiff. Linz as the retailer was expressly or implicitly offering to contract with the wholesaler pursuant to the customs and practices of the diamond industry of which he had knowl-

---

14. Deposition of Albert Hirsch, *supra* note 1, at 74.

15. Deposition of Aron Gordon, *supra* note 1, at 52–63.

16. Deposition of Carl Ericson, *supra* note 1, at 12.

edge or as a reasonably prudent diamond merchant should have had knowledge. In return the plaintiff "accepted" the offer by promising to send the merchandise desired by Linz. The oral acceptance by the plaintiff also bound him to follow accepted trade customs and practices as well. The actual mailing of the merchandise by the plaintiff was its performance under the contract which consequently established the level of financial liability of the defendants, upon receipt, in accordance with the industry customs and practices. Alternatively, the mailing of the goods would constitute acceptance. In either case the memorandum *embodied* the critical terms of the overall contract of the parties, including strict liability and the amount involved. *See* Verstandig & Sons, Inc. v. Sobel, 26 Misc.2d 649, 206 N.Y.S.2d 860, 863, 864 (1960). The following section delineates this aspect in greater detail. It should be noted that the Uniform Commercial Code does not demand artificially rigid points of contract definition with respect to offer and acceptance. *See* U.C.C. §§ 2–204, 2–206.

■ Where the selection was made personally by representatives of Linz in New York City, the foregoing cases indicate that the presumption arises that the parties contracted with reference to the place where the offer is accepted. This was New York. With respect to telephone orders, the same result pertains. Under Texas Conflict of Laws cases, when an acceptance is given by telephone, the situs of the contract is where the acceptor speaks his acceptance, and it is that law which controls the interpretation of the contract. *See* National Furniture Manufacturing Co. v. Center Plywood Co., 405 S.W.2d 115 (Tex.Civ.App., Tyler 1966, writ dism'd); Early-Foster Co. v. A.P. Moore's Sons, Inc., 230 S.W. 787 (Tex. Civ.App.—Texarkana 1921, no writ). *See also* Mullinix v. Hubbard, 6 F.2d 109 (8th Cir. 1925); 1 Williston on Contracts § 82A at 270 (Jaeger ed. 1957);

Restatement of Contracts § 65 (1932); Restatement of Conflicts § 326, Comment c (1934) [omitted from Restatement of Conflicts (Second)].

■ Another and perhaps more appropriate approach to this Conflict of Laws determination involves a consideration of: (1) which of the two states has the more significant relationship to the transaction and the parties; (2) the needs of interstate and international systems of commerce; (3) the relevant policies of the forum and interested states; and (4) the need for certainty, predictability and uniformity of result. *See* Restatement of Conflicts (Second) §§ 6, 188 (1971). The concentration of the diamond industry in New York City would clearly indicate that New York has a more significant relationship to the transactions at issue than does the State of Texas. The United States Supreme Court has indicated that an evaluation of "interests" is a proper consideration for Conflict of Laws determinations. Richards v. United States, 369 U.S. 1, 15, 82 S.Ct. 585, 594, 7 L.Ed.2d 492, 501 (1962). This approach appears to have received approval by the Supreme Court of Texas. Marmon v. Mustang Aviation, Inc., 430 S.W.2d 182, 187 (Tex.Sup.Ct.1968). The State of Texas has argued this theory before the U.S. Supreme Court in a different context. Texas v. New Jersey, 379 U.S. 674, 678, 85 S.Ct. 626, 628, 13 L.Ed.2d 596, 599 (1965). While this Court has not located Texas decisions containing comparable facts in which this analysis is used, the Fifth Circuit Court of Appeals has followed a similar approach in determining which law should be applied. *See* Teas v. Kimball, 257 F.2d 817, 824 (5th Cir. 1958). *See also* Fricke v. Isbrandtsen Co., 151 F.Supp. 465, 467 (S.D.N.Y. 1957).

The facts of this case simply do not reasonably support Linz's contention that "the entire performance of the contract . . . is to occur entirely within the State of Texas."

*Custom and the "Contract".* [17]

The intricacies of the diamond industry's customs and practices, as revealed in this case, have not received a thorough exposition by New York courts, although they evidently are of long standing. *See* Mann v. R. Simpson & Co., Inc., 286 N.Y. 450, 36 N.E.2d 658 (1941). The brevity of most opinions sheds only minimal light on the interrelationship of many of the issues before this Court. At least one other federal district court has made reference to this situation. United States Fidelity & Guaranty Co. v. Slifkin, 200 F.Supp. 563, 571 (N.D.Ala.1961). Some cases dealing with the industry bear upon issues not present here and are of little assistance other than indicating that title remains with the consignor. Mann v. R. Simpson, *supra*; Nelkin v. Provident Loan Soc. of New York, 265 N.Y. 393, 193 N.E. 245 (1934); Lindner v. Winston, 151 Misc. 499, 270 N.Y.S. 829 (New York City Ct. 1933). Nevertheless, the trend of New York law with respect to this industry appears to be clear.

As a general rule, New York cloaks bailees only with the duty to exercise ordinary care. Where bailed merchandise is stolen, a plaintiff bailor must usually prove negligence in order to recover. First Nat. City Bank v. American Broadcasting Co., 68 Misc.2d 861, 328 N.Y.S.2d 326 (Sup.Ct.1971). However, a bailee may contractually assume a greater duty of care and become in essence an insurer. Davis v. Lampert Agency, Inc., 30 A.D. 299, 291 N.Y.S.2d 745, 747 (1968); First National City Bank of New York v. Frederics-Helton Travel Service, Inc., 22 Misc.2d 481, 195 N.Y.S.2d 150 (Sup.Ct.1959); 5 N.Y.Jur., Bailment § 68 at 79 (1959). This is particularly true with respect to the diamond industry. Winfred Jewelry v. Spivack, 12 Misc.2d 74, 174 N.Y.S.2d 486 (Sup.Ct.1958); Allemania Fire Ins. Co. v. Keller Diamond Corp., 101 N.Y.S. 2d 9, 13 (Sup.Ct.1950), rev'd on other grounds, 278 App.Div. 899, 104 N.Y.S.2d 875 (1951); Zaidens v. Salter, 142 Misc. 439, 254 N.Y.S. 602 (New York City Ct. 1932). *See also* United States Fidelity & Guaranty Co. v. Slifkin, 200 F.Supp. 563, 567 (N.D.Ala.1961).

It must also be noted that New York law looks with disfavor upon unreasonable limitations of liability with respect to valuable bailed merchandise in the absence of proof that the bailor knew or should have known that the bailee was seeking to limit liability. *See, e. g.,* Melodee Lane Lingerie Co. v. American District Telegraph Co., 18 N.Y.2d 57, 271 N.Y.S.2d 937, 946, 218 N.E.2d 661, 667 (1966); Willard Van Dyke Productions, Inc. v. Eastman Kodak Co., 16 A.D.2d 366, 228 N.Y.S.2d 330, 334–335 (Sup.Ct.1962), aff'd, 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693 (1963); Arkush v. Citron, 14 Misc.2d 707, 180 N.Y.S.2d 514 (New York Mun. Ct.1958); Grayson-Robinson Stores v. Courtney, 140 N.Y.S.2d 469 (Sup.Ct. 1955), aff'd, 1 A.D.2d 947, 151 N.Y.S.2d 605; Rappaport v. Phil Gottlieb-Sattler, Inc., 280 App.Div. 424, 114 N.Y.S.2d 221 (Sup.Ct.1952), aff'd, 305 N.Y. 594, 111 N.E.2d 647 (1953); Howard v. Handler Bros. & Winell, Inc., 200 Misc. 600, 103 N.Y.S.2d 786 (Sup.Ct.1951), aff'd 279

17. Under this Court's Conflict of Laws determination New York law is applied in determining the contractual relationship between the parties. This Court is satisfied that the same result would pertain under Texas law considering contracts and trade custom and usage. *See, e. g.,* Miller v. Gray, 136 Tex. 196, 149 S.W.2d 582 (1941); State v. F. & C. Engineering Co., 438 S.W.2d 647 (Tex.Civ.App., Houston 1969, writ ref'd n. r. e.); Fox v. Gallo, 428 S.W.2d 127 (Tex. Civ.App., Amarillo 1968, writ ref'd n. r. e.);

Republic National Bank of Dallas v. National Bankers Life Insurance Co., 427 S.W.2d 76, 80 (Tex.Civ.App., Dallas 1968, writ ref'd n. r. e.); Harrison v. Facade, Inc., 355 S.W.2d 543 (Tex.Civ.App., Dallas 1962); Thompson v. Graham, 333 S.W.2d 663 (Tex.Civ.App., Eastland 1968, writ ref'd n. r. e.); Mathews v. Ryan, 320 S.W.2d 44 (Tex.Civ.App., Amarillo 1958); Kerr v. Taylor, 317 S.W.2d 589 (Tex.Civ.App., San Antonio 1958, writ dism'd); 58 Tex.Jur.2d Usages and Customs §§ 10–17 (1964).

App.Div. 72, 107 N.Y.S.2d 749, aff'd, 303 N.Y. 990, 106 N.E.2d 67 (1952); 5 N.Y.Jur., Bailment § 45 at 51, § 71 (1959).

While full consideration of the parole evidence rule must be given in proper instances, the fact remains that customs and usages may well bear upon a contract of bailment. A "custom" has been defined generally as a practice which by its universality and antiquity has acquired the force and effect of law in respect to the subject matter to which it relates, this practice often being judicially noticed without proof. 21 Am.Jur.2d, Customs and Usages § 1 at 676–77 (1965). *See also* United States v. Arredondo, 6 Pet. (U. S.) 691, 715, 8 L.Ed. 547, 556 (1832); Uniform Commercial Code § 1–205. Customs develop through necessity and mutual trust between responsible business persons. To some extent the boundaries are not delineated with as much clarity as, for example, they might be in a complicated written contract. Nevertheless, particular trends develop over a period of time and crystallize into greater certainty and specificity of conduct at the more critical points of such business activity. Where such customs are consistent with the terms of the writing, or where they supply by implication necessary or useful provisions about which the instrument in question is silent, such customs may be incorporated into the contract and become a part. *See* Jones v. Chaney & James Construction Co., 399 F.2d 84, 89 (5th Cir. 1968); A. F. Pylant, Inc. v. Escambia Treating Co., 276 F.2d 919, 924 (5th Cir. 1960); Baker v. Nason, 236 F.2d 483, 492 (5th Cir. 1956); Edward E. Morgan Co., Inc. v. United States, 230 F.2d 896, 902 (5th Cir. 1956); Valley National Bank of Long Island v. Babylon Chrysler-Plymouth, Inc., 53 Misc.2d 1029, 280 N.Y.S.2d 786, 788 (Sup.Ct. 1967), aff'd, 28 A.D.2d 1092, 284 N.Y.S. 2d 849 (1967); American Fabrics Co. v. Benedict, 166 Misc. 449, 1 N.Y.S.2d 1008 (Sup.Ct.1937), aff'd 255 App.Div. 957, 8 N.Y.S.2d 667 (1938); 21 Am.Jur.2d Customs and Usages §§ 21–25, pp. 695–702 (1965); 5 N.Y.Jur. Bailment § 45 at 50 (1959); 5 Williston on Contracts §§ 651, 652 (Jaeger ed. 1969); Restatment of Contracts §§ 245–49 (1932); Uniform Commercial Code §§ 2–202, 2–208. However, where customs are not consistent with written provisions, but, in fact, contradict, negate, or vary the terms of an unambiguous writing, proof of such customs is inadmissible under the parole evidence rule. Division of Triple T. Service, Inc. v. Mobil Oil Corp., 60 Misc.2d 720, 304 N.Y.S.2d 191, 203 (Sup.Ct.1969); Nelkin v. Farber, 196 Misc. 545, 94 N.Y.S.2d 272 (Sup.Ct. 1949).

It is apparent from the evidence that well-established customs and practices exist in the diamond industry which are not reduced to recitations within the all-risk memorandum and which New York law holds are incorporated into and become a part of the "contract" if not inconsistent with the writing. This being the case, the role of the memorandum merits further consideration. A diamond memorandum has been described as being:

> designed to serve two purposes. It serves as a receipt, evidencing by the recipient's signature that [the goods were received]. It also sets out the conditions under which the recipient may dispose of the said merchandise. In the latter connection, its terms are contractual, providing for the owner to recognize a sale under those conditions and forbidding the recipient or bailee to dispose of the goods on any terms except those set out in the document. As such, it is a contract, and its terms may not be contradicted by parol.

Hartog v. Mehle, 14 A.D.2d 336, 220 N. Y.S.2d 994, 997 (1960). *See also* Verstandig & Sons, Inc. v. Sobel, 26 Misc.2d 649, 206 N.Y.S.2d 860 (Sup.Ct.1960); Nelkin v. Farber, 196 Misc. 545, 94 N. Y.S.2d 272 (Sup.Ct.1949); Green v. Wachs, 254 N.Y. 437, 173 N.E. 575

(1930). From a study of the above authorities, it becomes apparent that the memorandum is actually a partially integrated contract. *See also* Restatement of Contracts §§ 228–32, 238–40 (1932). By embodying the more critical elements of the larger contract, the memorandum also serves as a receipt and a writing sufficient to satisfy the Statute of Frauds.

■■■■ In light of the challenges raised by the defendants, it is appropriate to determine whether or not the memoranda in this case, each being identical, are ambiguous.

> An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987, 994 (S.D.N.Y. 1968). When considering the customs and usages of the diamond industry in this context, it becomes apparent that the recitations of the memoranda are unambiguous. *See* Verstandig & Sons, Inc. v. Sobel, 26 Misc.2d 649, 206 N.Y.S. 2d 860, 864 (Sup.Ct.1960). Even if it were to be assumed that the provisions of the memoranda were unclear or ambiguous to a layman, such language is nevertheless clear and succinct to those cognizant of the customs, practices, usages and terminology in the diamond industry. It is set forth therein that the consignee is liable for all risks whatsoever, without regard to negligence, for the full memorandum price of the items not returned. Although the plaintiff has not argued custom and usage in support of his claim, except as it bears upon elements of damages, it is clear that it

supports his argument regarding liability as well.

■■■■ The defendants have not shown that any limitation of liability was intended by the parties, or that it was an element of a well-established custom of which the plaintiff should have been aware and which did not vary the terms of the memorandum. Thus, the plaintiff is entitled to summary judgment. Furthermore, even if this Court assumes that the various memoranda were ambiguous on the theory that they did not fully integrate all terms of the contract (which this Court does not do), evidence of custom and usage would be admissible here to resolve the ambiguity, as it is not inconsistent with the memorandum. *See* Webb & Sons, Inc. v. Hamilton, 30 A.D.2d 597, 290 N.Y.S.2d 122 (1968); Hartog v. Mehle, 14 A.D.2d 336, 220 N.Y.S.2d 994, 998 (1960) (Justice McNally concurring).

### Liability of Gordon's, the "Parent" Corporation

■■■ Defendant Gordon's seeks to escape liability on the theory that, notwithstanding its substantial ownership of and substantial commonality of boards of directors with Linz, it is separate and distinct from defendant Linz with respect to the conduct of business. This Court has closely considered the voluminous record in this case, the communications regarding insurance coverage and the relationship between the two defendants as brought out by the evidence. It is the considered opinion of this Court that the proof, particularly those matters with respect to communications regarding insurance coverage upon which the plaintiff relied to its detriment, compel the conclusion that Gordon's and Linz are not separate and distinct and that defendant Gordon's should be held jointly and severally liable with defendant Linz.[18] *See gen.,* Fletcher,

---

18. *See* notes 11 to 13 *supra* and accompanying text.

Cyclopedia of Private Corporations § 43 (rev. ed. 1963).

### Damages

■■ The record reveals, and defendant Linz admits, that a quantity of diamonds and jewelry totaling approximately $273,550 was sent by the plaintiff on all-risk memoranda which were subsequently stolen from Linz.[19] With respect to some items, the plaintiff unilaterally increased the value or asking price of some merchandise already in the possession of Linz which had not yet been sold. Linz agreed.[20] This was prior to the theft and was done in accordance with the custom in the trade. In their memorandum in opposition to the plaintiff's present motion for summary judgment, the defendants state that if liability attaches, the common-law measure of damages would be applicable unless altered by a trade custom. The defendants contend that the plaintiff must show the actual damages suffered rather than the stated "value" on the memoranda. The defendants allege that three fundamental issues of fact are raised:

(1) the amount of the actual damages incurred by plaintiff as the result of the loss, on which factual issue plaintiff has the burden of proof and no evidence has been placed of record;

(2) whether a custom or practice in the trade defines plaintiff's measure of damages as the asking price stated in the memoranda, upon which issue plaintiff has the burden of pleading and proof; and

(3) whether it is, in fact, the custom and practice in the trade that, in the event of an underinsured loss, the consignor is entitled to be reimbursed, at the most, his cost plus a modest profit for expenses, as is the position of defendant.

With respect to (3) above, it has clearly been shown to be neither the custom and practice nor the law of New York. With respect to (2) above, the plaintiff has clearly shown by uncontroverted evidence that the asking price is the accepted measure of damages in the diamond industry as established by custom and practice. This being the case, (1) is not a necessary element of proof. One element of the parties' contract was full liability from all risks for the full memorandum price. This is the custom and practice of the diamond industry, the established law of New York and the appropriate remedy under Uniform Commercial Code § 2–709. The plaintiff is entitled to recover the memorandum price plus any increase shown to conform to the industry custom and practice.

■■■ The plaintiff also seeks exemplary damages for the defendants' wrongful detention of the jewelry and their wilful and malicious failure to submit plaintiff's claim to defendants' insurance carrier which has, it is alleged, funds available to pay the plaintiff's claim in full. The rule in Texas is that exemplary damages cannot be recovered for a breach of contract when the breach is not accompanied by an independent tort, even if the breach is brought about capriciously and with malice. Orgain v. Butler, 478 S.W.2d 610, 613 (Tex.Civ. App., Austin, 1972, no writ); Graham v. Turner, 472 S.W.2d 831, 838 (Tex. Civ.App., Waco, 1971, no writ); McDonough v. Zamora, 338 S.W.2d 507, 513 (Tex.Civ.App., San Antonio, writ ref'd n. r. e.); 17 Tex.Jur.2d, Damages § 185 (1960). No independent tort having been shown, these claims, as variously phrased by the plaintiff, must fail.

■■ The plaintiff also seeks recovery of attorneys fees in accordance with Vernon's Tex.Rev.Civ.Stat.Ann. art. 2226 (1971), as amended, art. 2226 (Supp.1973). The plaintiff alleges that

19. Letter of Linz to plaintiff, March 24, 1970. Exhibit E to verified complaint.

20. *See, e. g.,* Instrument No. 8, note 11 *supra,* at Exhibit 6.

his is an action for "material furnished" or upon a "sworn account" within the meaning of this statute. Article 2226 provides:

Any person, corporation, partnership, or other legal entity having a valid claim against a person or corporation for services rendered, labor done, material furnished, over charges on freight or express, lost or damaged freight or express, or stock killed or injured or suits founded upon a sworn account or accounts, may present the same to such persons or corporation or to any duly authorized agent thereof; and if, at the expiration of 30 days thereafter, the claim has not been paid or satisfied, and he should finally obtain judgment for any amount thereof as presented for payment to such persons or corporation, he may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees. The amount prescribed in the current State Bar Minimum Fee Schedule shall be prima facie evidence of reasonable attorney's fees. The court, in non-jury cases, may take judicial knowledge of such schedule and of the contents of the case file in determining the amount of attorney's fees without the necessity of hearing further evidence.

Texas law provides that in the absence of a contractual provision between parties allowing the payment of an attorney's fees, such an award is allowable only if authorized by Article 2226. Furthermore, since this statute is penal in character, it must be strictly construed. Unless the prevailing party's claim for attorney's fees falls into one of the seven classes enumerated in the statute, it must fail. Tenneco Oil Co. v. Padre Drilling Co., 453 S.W.2d 814, 818 (Tex.Sup. 1970); Eisenbeck v. Buttgen, 450 S.W. 2d 696, 702 (Tex.Civ.App., Dallas, 1970). The legislative history of this statute indicates that the allowance of attorney's fees was intended to promote the prompt payment of specified classes of claims and to discourage unnecessary litigation

with respect to them. As such, the act was made "as broad in its scope as seemed necessary from the practical standpoint," although strictly limited to those seven classes. See Tenneco Oil Co., supra, 453 S.W.2d at 819.

The term "material", as used in Article 2226 which provides attorney's fees for "material furnished", has been broadly defined to mean "the substance or substances, or the part, goods, stock or the like of which anything is composed or may be made". Pacific Coast Engineering Co. v. Trinity Construction Co., 481 S.W.2d 406, 407 (Tex.Sup. 1972). Thus, it has been held that the furnishing of a disc plow and disc harrow, to be mounted on a jeep prior to use, was not the furnishing of "material" within the meaning of the statute, Davenport v. Harry Payne Motors, 256 S.W.2d 245 (Tex.Civ.App., Austin, 1953, no hist.), whereas the furnishing of fabricated water control gates, to be installed in a dam to control water level, was the furnishing of "material". Pacific Coast Engineering Co., supra. The plaintiff states that a piece of jewelry is a highly personal item which frequently must be stylized by retail jewelers in order to satisfy the tastes and desires of his clientele. This may involve the addition to or removal from the original mounting of baguettes, marquise, or other diamond shapes so as complement to advantage the principal diamond. Necklaces and bracelets often are either shortened or lengthened. In such a manner, plaintiff contends that the jewelry it supplied was material furnished within the meaning of the statute. The defendants have not disagreed with these statements, although they disagree with plaintiff's conclusions.

The Court is of the opinion that while raw diamonds might well be the substance of which jewelry might be composed, thus constituting "material", the providing of finished jewelry does not appear to be within the meaning of the statute. The fact that the jewelry is subsequently altered does not appear to change the character of the transaction.

This does not end the Court's inquiry, however, as attorney's fees are properly recoverable if the transaction is, as alleged by plaintiff, a suit founded upon a sworn account. Within the meaning of the statute:

a sworn account is defined according to its popular sense and applies only to transactions between persons, in which there is a sale upon one side and a purchase upon the other, whereby title to personal property passes from one to the other, and the relation of debtor and creditor is thereby created by general course of dealing (which may include only one transaction between the parties). It does not mean transactions between parties resting upon special contract.

Meaders v. Biskamp, 159 Tex. 79, 316 S.W.2d 75, 78 (1958). *See also* Van Zandt v. Fort Worth Press, 359 S.W.2d 893, 895 (Tex.Sup.1962); Bagby Land and Cattle Co. v. California Livestock Commission Co., 439 F.2d 315, 318 (5th Cir. 1971). The defendants contend that the facts of this case involve a "special contract" for which attorney's fees are not recoverable under the statute. *Meaders, supra*; Eisenbeck v. Buttgen, 450 S.W.2d 696, 702 (Tex.Civ.App., Dallas, 1970, no hist.). Under Texas law a special contract is:

one with peculiar provisions or stipulations not found in the ordinary contract relating to the same subject matter and such provisions are such as, if omitted from the ordinary contract, the law will never supply.

*Eisenbeck, supra*, 450 S.W.2d at 702. Special contracts generally require circumstances other than transactions regularly occurring in the ordinary course of a business. *See, e. g.*, Mauldin v. Sullivan, 484 S.W.2d 157 (Tex.Civ.App., Eastland, 1972, writ ref'd n. r. e.); Success Motivation Institute, Inc. v. Jamieson Film Co., 473 S.W.2d 275 (Tex.Civ. App., Waco, 1971, no hist.). The transactions between the plaintiff and defendants were in full conformance with regular customs and usages in the diamond industry, and thus they involve no special contracts.

The defendants further contend that the transactions do not involve a "sworn account" if, as this Court holds, the customs and practices in the diamond industry as well as New York law provide that title does not pass from consignor to consignee with respect to all-risk memorandum consignment transactions. This Court has found no case adequately giving guidance as to Texas law in consignment situations. The Court concludes that under the circumstances the Texas courts would look at the scope and purpose of Article 2226 as well as analogous fact situations.

Rule 185, Texas Rules of Civil Procedure, provides the format for pleading sworn accounts in state courts and gives further indication of what constitutes a "sworn account" under state law.

When any action or defense is founded upon an open account or other claim for goods, wares and merchandise, including any claim for a liquidated money demand based upon a written contract or founded on business dealings between the parties, or is for personal service rendered, or labor done or labor or materials furnished, on which a systematic record has been kept, and is supported by the affidavit of the party, his agent or attorney taken before some officer authorized to administer oaths, to the effect that such claim is, within the knowledge of affiant, just and true, that it is due, and that all just and lawful offsets, payments and credits have been allowed, the same shall be taken as prima facie evidence thereof, unless the party resisting such claim shall, before an announcement of ready for trial in said cause, file a written denial, under oath, stating that each and every item is not just or true, or that some specified item or items are not just and true . . . .

Texas cases suggest that judicial attention should be given to the nature of the business relationship and whether it is

reasonably identical to one of the included classes under Article 2226 when attorney's fees are at issue. For example, a court may look to the contractual relation between the parties to see if the facts are in the "nature" of a sworn account. *See* Davis Bumper to Bumper, Inc. v. American Petrofina, Co., 420 S.W.2d 145, 153 (Tex.Civ.App., Amarillo, 1967, writ ref'd n. r. e.); McDonald v. Watkins, 353 S.W.2d 905, 907 (Tex.Civ. App., Ft. Worth, 1962, no hist.). Similarly, an "open account" (one in which one or more contractual elements remain to be ascertained, such as time of payment) may become "sworn" when a party files his affidavit in accordance with Rule 185, Tex.R.Civ.P. McDonald v. Watkins, *supra,* 353 S.W.2d at 908.

It is the opinion of the Court that the overall character of the transactions at issue bears substantial similarity to those requisites of a sworn account. For example, the jewelry was personal property, and the agreement relating to the delivery of the goods contains strong similarities to a conditional "sale" by plaintiff on one side and a conditional "purchase" by defendants on the other, thus creating a debtor-creditor relationship in accordance with customs and usages in the trade. Systematic records were kept as required by Tex.R.Civ.P. 185. The amount owed by defendants for the jewelry was calculated from an open account on which offsets, payments and credits were made as they arose, and a final liquidated amount due was capable of being calculated at any time and was calculated prior to plaintiff's making demand of the defendants. The only indicia of a sworn account remaining in question, and upon which no Texas case has been found, is that of passage of title.

The passage of title in commercial settings is one depending upon many interwoven legal and equitable principles. For example, title may pass to a customer who, in the ordinary course of business, purchases from a retailer's stock an item which may be on consignment.

The Uniform Commercial Code provides that the possession of goods on consignment by a consignee who deals in goods of that kind gives him the "power" to transfer all rights to that buyer, notwithstanding any existing agreements between the consignor and consignee regarding title and regardless of how the consignee came into possession of the goods. Tex.Bus. & Comm.Code Ann. § 2.403, V.T.C.A. Similarly, those same goods are subject to the reach of the consignee's creditors. Tex.Bus. & Comm. Code Ann. § 2.326. Thus, the fact of possession gives the consignee virtually unlimited power under the U.C.C. to deal with title, regardless of agreements made with the consignor.

To avoid an interpretation of the facts of this case as a "sale" for purposes of Article 2226, the defendants characterize the plaintiff's cause of action as one for conversion for which attorney's fees are not recoverable, citing 14 Tex.Jur.2d Conversion § 30 (1960). While this rule is correct for some types of "conversion", those conversions factually identical to claims within the scope of Article 2226 will permit recovery of fees. *See, e. g.,* Ferrous Products Co. v. Gulf States Trading Co., discussed below.

The Court has found two cases of particular value in determining what Texas courts would do with the facts here present. In the first case, the plaintiff was engaged in the retail sale of steel products and had made arrangements to deliver a shipment to a particular customer. The defendant, another customer who was expecting delivery of a similar shipment ordered from another source, took possession of the shipment without the knowledge of the plaintiff, converted it to his own use and inserted his name on the shipment invoice in lieu of the intended consignee. Notwithstanding the fact that the state court expressly held that title had not passed from plaintiff to the defendant, it upheld plaintiff's recovery of value and attorney's fees on theories of quasi-contract and material furnished respectively. The court held

that Article 2226 was broad enough to cover a situation where goods, wares and merchandise are received by a person, whether it be under express contract, one implied in fact, or one implied in law. Ferrous Products Co. v. Gulf States Trading Co., 323 S.W.2d 292 (Tex.Civ. App., Houston, 1959), aff'd, 160 Tex. 399, 332 S.W.2d 310 (1960). The Texas Supreme Court noted that when a proper demand for payment was made, a valid claim "arose" in favor of the plaintiff who was then entitled to recover the attorney's fees. *Id.*, 332 S.W.2d at 313.

The second case involved the delivery of goods by a wholesaler to a retailer under an agreement bearing much similarity to a consignment. The retailer-defendant had a time limit within which to pay for the items coupled with an agreement that the wholesaler-plaintiff would pick up goods not sold within 90 days and credit the account. The state court described the transaction as being a "sale or return" transaction under U. C.C. § 2–326. Attorney's fees were allowed. Collier v. B & B Parts Sales, Inc., 471 S.W.2d 151 (Tex.Civ.App., Tyler, 1971, no hist.).

The court in *Collier*, quoting Texas Jurisprudence Second, indicated that many transactions that might have been regarded as consignments under former law will be regarded as sales under the Code. In the case before this Court, the facts also would require the classification of these transactions as being "sale or return" transactions under the Code. Tex.Bus. & Comm.Code Ann. §§ 2.326, 2.403, and Comments. *Ferrous Products Co., supra,* may stand for the proposition that it is not absolutely necessary for legal title to have passed before a plaintiff may recover attorney's fees on a claim which in all other respects bears the markings of a sworn account.

Upon full consideration of the facts in the case before this Court, as well as the foregoing authorities, this Court concludes that Texas courts would allow attorney's fees in these circumstances. If the actual passage of title is an absolute prerequisite to the classification of a "sworn account" under Texas law, which does not appear to be the case, then it may be judicially regarded as having passed at the moment the defendant became legally liable for "all risks" under the memoranda. This was at the moment of theft when the defendants could no longer return the goods to the plaintiff for credit. Thus, the business relationship is in the "nature" of a sworn account, *Davis Bumper to Bumper, Inc., supra,* 420 S.W.2d 145, 153, in which plaintiff's entitlement to attorney's fees "arose" under the statute, *Ferrous Products Co., supra,* 332 S.W.2d at 313, when plaintiff computed the total amount due giving due regard to all just and lawful offsets, payments and credits, Rule 185, Tex.R.Civ.P., thus converting the then existing account into a "sworn" one, McDonald v. Watkins, *supra,* 353 S.W.2d at 908, by making a liquidated money demand. Rule 185, Tex.R.Civ.P.

■ The plaintiff also seeks recovery of interest from January 12, 1970, although no rate of interest is indicated. It would appear that interest is proper from the date that the cause of action accrues until the date of judgment at a rate allowed by state law. *See* Gurley v. Lindsley, 466 F.2d 498 (5th Cir. 1972).

### Conclusion

Upon a review of the evidence, pleadings and authorities, it is now clear that summary judgment is proper in favor of the plaintiff herein against both defendants, jointly and severally. The parties should seek to stipulate as to: (1) the memorandum price, or increased price, of the stolen merchandise belonging to plaintiff; (2) the amount of attorney's fees; (3) the appropriate interest calculations; and (4) court costs. Once these items have been finalized as to amount, an appropriate final judgment will be submitted for entry. If such stipulation is not possible as to one or more items, upon proper motion a hearing by this Court will be held.