**BAUMGOLD BROTHERS, INC., et al., Plaintiffs,**

v.

**ALLAN M. FOX COMPANY, EAST,**

and

**The United States of America, Defendants.**

**No. C 71–322.**

United States District Court, N. D. Ohio, E. D.

Dec. 20, 1973.

See also D.C., 336 F.Supp. 175.

Ronald H. Isroff, Cleveland, Ohio, for plaintiffs.

Leonard B. Scharfeld, Cleveland, Ohio, for defendant Allan M. Fox Co.

Paul Brickner, Asst. U. S. Atty., Cleveland, Ohio, for defendant United States.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BATTISTI, Chief Judge.

This is an action against the Allan M. Fox Company, East, seeking damages for breach of contract or, in the alternative, the conversion of property. Plaintiff is also suing the United States for breach of an insurance contract evolving from plaintiffs' shipment of merchandise by registered mail. The case came on for trial before this Court on September 13, 1973, the parties having waived their right to trial by jury. The Court makes the following findings of fact and conclusions of law in accordance with Rule 52(a), F.R.Civ.P.

## FINDINGS OF FACT

1. Plaintiff Baumgold Brothers, Inc. (hereinafter Baumgold) is a citizen of New York, having its principal place of business in that state. It is engaged in the wholesale jewelry business.

2. Plaintiff Orion Insurance Company, Ltd. (hereinafter Orion) is a company registered under the laws of England, having its principal place of business in that country. It is engaged in the insurance business.

3. Plaintiff Leonard Toomey (hereinafter Toomey) is a citizen of England and is an underwriter at Lloyds, London, and a duly designated representative of the Underwriters at Lloyds, London (hereinafter Underwriters) who are individuals engaged in the insurance business.

4. Defendant Allan M. Fox Company, East (hereinafter Fox) was incorporated under the laws of the State of Ohio and at the relevant times in question was engaged in the retail jewelry business in that state.

5. Defendant United States of America (hereinafter United States) is a party to this action through the operation of the United States Postal Service.

6. On June 5, 1968, Fox mailed its purchase order to Baumgold requesting that a small selection of diamonds be "sent" to Fox for examination by a potential buyer. Delivery was requested on June 12, 1968.

7. Baumgold received the purchase order request on or before June 10, 1968.

8. Baumgold, as related by Mr. Theodore Baumgold, Treasurer of the plaintiff corporation, had previously done business with Fox. In 1967 Baumgold invoiced Fox for $1476.65 and shipped Fox merchandise on a memorandum basis valued at $16,406.00. Prior to June 10, 1968, Baumgold had invoiced Fox in the amount of $3323.35 and had sent merchandise worth $29,085.00 on memo-

randum. Mr. Baumgold further explained that in the jewelry trade a memorandum shipment permitted the retail jeweler the right to return merchandise to the wholesaler if the former was not able to procure a buyer.[1]

9. Although Fox sent its purchase order, Baumgold determined from its prior course of dealing with Fox that an outright sale was not contemplated. Instead Baumgold treated the order as a request for a shipment on a memorandum basis.

10. On June 10, 1968, Theodore Baumgold, one of the principals authorized to fill orders, selected the diamonds and, in conformity with their established procedure, gave the merchandise to an employee, Mrs. Betty Lo-Giudice, for initial packaging and weight verification.

11. Mrs. LoGiudice wrapped the diamonds in paper and placed them in an envelope along with a copy of Baumgold's All Risk Memorandum,[2] a document intended to constitute the entire agreement of the parties.

12. Baumgold's shipping clerk, Mr. Charles Valverde, recorded a registry number for the shipment, 3067183, and Fox's name and address on a manifold, an official form provided by the Postal Service. Valverde placed the envelope containing the diamonds into a box, sealed the box, and affixed a mailing label addressed to Fox.

13. On June 10, 1968, Valverde placed the shipment under the control of the United States for delivery to Fox's place of business by registered and insured mail. A post office clerk signed and dated the original manifold and gave a copy to Valverde.

14. Baumgold, in addition, sent Fox a letter dated June 10, 1968, acknowledging the order and expressing its intent to ship the requested diamonds.

15. The actual declared value of the diamonds for the purpose of insurance with the United States during mailing, as determined by Baumgold's office manager, was $8000.00. The value to Baumgold, as evidenced by computing the per/carat price data contained on the All Risk Memorandum was $10,033.00. The former figure represents Baumgold's cost or inventory valuation.[3]

16. Mr. Chester Olinsky testified that on June 12, 1968, he was a postman with twenty years experience and was assigned a delivery route which included Fox's store. He further stated that on this date he tied three packages together which were addressed to Fox, filled out

1. Deposition of Theodore Baumgold, pp. 6–7, admitted by stipulation.

"Q. What happens to these diamonds after you lend them to the merchant, so to speak?

"A. The merchant frequently asks us to borrow some diamonds so that they can show them to a customer. If he makes a sale, he reports that sale to us and a sale is consummated between us and the retailer. . . .

"Q. If the sale is not finalized, what happens?

"A. He returns the diamonds.

"Q. Is it customary to ship diamonds to customers on a memorandum basis?

"A. It is customary. We do that very frequently."

2. The following language of the document is relevant to the case: "The merchandise described below is delivered to you on memorandum only, at your risk from all hazards, regardless of the cause of the loss or damage, only for examination and inspection by prospective purchasers, upon the express condition that all such merchandise shall remain the property of BAUMGOLD BROTHERS, INC., and shall be returned on demand, in full, in its original form. Until the merchandise is returned and actually received by us, you are fully responsible therefor, and, in the event of damage or loss, whether caused by you or by another, whether or not under your control, you will indemnify us immediately by payment of the stated value which represents the extent of the actual loss and is not intended to constitute a price for the sale of the merchandise. . . . Receipt of the merchandise constitutes your agreement to the foregoing terms which represent the entire contract with respect to the merchandise herein described; this contract cannot be varied by oral statements, dealings with respect to other merchandise or any contrary custom of trade."

3. Deposition testimony of Mrs. Sylvia Sokoloff, page 38, admitted by stipulation.

a white receipt slip and placed it with the bundle of packages for Fox. The receipt included registry number 3067183. Olinsky then gave the parcels to Mr. Howard Friedman for delivery.

17. Mr. Friedman, temporarily assigned to Olinsky's route, entered Fox's store during the morning of June 12, 1968, and placed the packages and other letters on a store counter. He uttered an expression intended to notify Fox personnel that the mail was being delivered. Friedman then left the store, leaving the mail on the counter, neglecting to ascertain whether a Fox employee was in the store, and failing to obtain a signed receipt for the Baumgold shipment sent to Fox by registered mail.

18. During the time that Friedman left the packages and letters on the counter, Mr. Allan Fox and Mrs. Ida Hirsch were working at their desks in the rear office of the store. They were not alerted to the presence of the mail until a customer entered the store and so informed them. Mr. Fox attended to the customer's needs. Mrs. Hirsch took the mail into the back office. She further testified, and the Court finds, that there were no packages on the counter at the time she was alerted to the presence of the mail.

19. On the afternoon of June 12, 1968, Friedman returned to the store to locate the mail receipt and to have it signed. He was permitted to search the office wastebaskets and the outside trash barrels but found neither the receipt nor the package wrappings.

20. Olinsky made a second white receipt slip on June 13, 1968, and on June 17, 1968, requested another Fox employee, Mrs. Ann Petti, now Woelper, to sign the receipt for three packages which Olinsky stated were delivered on June 12th. Woelper stated that she had no knowledge of the delivery, but signed the receipt on Olinsky's representation that the temporary postman had forgotten to obtain a signature.

21. During the afternoon of June 17, 1968, Woelper told Mr. Fox that she had signed a mail receipt for packages delivered on June 12th. Fox became angered, explaining that no packages had been delivered. He notified Olinsky and repeated attempts were made to recover the signed receipt.

22. On June 17, 1968, Fox notified Baumgold by an air mail postcard that the diamonds had not yet been delivered. Baumgold initiated a trace and subsequently submitted an indemnity claim to the United States. Baumgold's office manager made an undeliberate representation on the claim form that this shipment of diamonds was not commercially insured.[4] The claim was rejected on the grounds that a receipt for the package was signed by Fox.

23. Orion insured Baumgold against loss or damage to its personal property in an amount up to $10,000.00. As a result of the loss of the diamonds, Orion reimbursed Baumgold in the amount of $750.00 and the parties entered into a subrogation agreement for that amount.

24. Underwriters insured Baumgold against loss or damage to its personal property in an amount up to $90,000.00. Underwriters reimbursed Baumgold in the amount of $6750.00 and entered into a subrogation agreement with Baumgold for that amount.

## CONCLUSIONS OF LAW

1. Jurisdiction over Fox is based on diversity of citizenship, 28 U.S.C. § 1332.

2. Jurisdiction over the United States is pursuant to 28 U.S.C. § 1346(a)(2) which vests original jurisdiction in the district courts "concurrent with the Court of Claims of all claims not exceeding $10,000.00 founded . . . upon any contract . . . with the Government of the United States, or for damages . . . in respect to which claims the party would be entitled to redress against the United States." See Baumgold Brothers, Inc. v.

4. *Id.* at 40.

Allan M. Fox Co.—East et al., 336 F. Supp. 175 (N.D.Ohio 1972).

3. The Uniform Commercial Code has been enacted in both Ohio and New York. The applicable provisions of the Code to this case are identical in each state, thus no conflict of law problem appears. Dorton v. Collins and Aikman Corp., 453 F.2d 1161, 1163 (6th Cir. 1972).

4. Baumgold and Fox were parties to a contract for the sale of goods. Under R.C. § 1302.09(A)(2), UCC § 2–206(1)(b), "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods. . . ." Fox's purchase order constituted the offer in this transaction. Baumgold indicated its acceptance by two means. It sent a prompt response by mail acknowledging the order and promising performance; in addition it contemporaneously mailed the requested diamonds to Fox.

■ 5. Baumgold's All Risk Memorandum enclosed with the shipment of diamonds constitutes a written integration of the contract in dispute. This form sets forth terms that are additional to and different from the terms of Fox's purchase order. At common law, the terms of a binding acceptance were required to be a mirror image of the terms contained in the offer. Dorton, supra, at 1165–1166 (citations omitted). The UCC has repudiated this requirement and permits a variant acceptance to bind the offeror "unless acceptance is expressly made conditional on assent to the additional or different terms." R.C. § 1302.10, UCC § 2–207.

Section 2–207 provides:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."

In discussing the operation of 2–207(1) and (2), the Court of Appeals for the Sixth Circuit in Dorton, supra, 453 F.2d 1161, 1166 (1972) stated that the formation of a contract must initially be demonstrated under 2–207(1) which permits a conditional acceptance to bind the offeror. Section 2–207(2) then operates to determine which of the conditions become part of the contract. More specifically, the Court held that in order to find that a purported acceptance fails to result in the formation of a contract

"it is not enough that an acceptance is expressly conditional on additional or different terms; rather, an acceptance must be expressly conditional on the offeror's assent to those terms. . . . [W]e believe that [2–207(1)] was intended to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein. Id. at 1168."

In the instant transaction, Baumgold's form indicates that its adoption was an express condition to its acceptance. Although the language of the form provides that "[r]eceipt of the merchandise constitutes [the buyer's] agreement to the foregoing terms," Fox's assent was not the express condition to Baumgold's acceptance. This construction is amply substantiated by Baumgold's act of shipping the diamonds before Fox's assent

was forthcoming. Clearly, Baumgold was willing to proceed with the transaction without the offeror's assent in accordance with the form. In *Dorton,* the buyer's agreement to the conditions of the seller's form could have been obtained in a variety of ways, including the buyer's receipt of the merchandise. There the Court held that the seller had made a conditional acceptance, recognized the contract under 2–207(1) and proceeded to determine which of the additional proposals were part of the contract under 2–207(2). *Id.*

6. The All Risk Memorandum is the integrating document of the contract since it specifies that its terms "represent the entire contract with respect to the merchandise herein described. . . .," and the terms of the document do not "materially alter" the contractual intent of the parties under 2–207(2)(b).[5] The understanding of the parties as evidenced by the contract document and their prior course of dealing [6] was to enter into a sale or return contract, defined by R.C. 1302.-39(A)(2), UCC 2–326(1)(b), as a "transaction . . . [where] the goods are delivered primarily for resale."

The document specifies that the diamonds were sent "on memorandum." According to the testimony of Mr. Theodore Baumgold, "memorandum" is a trade term signifying a sale or return contract. The parties utilized the sale or return in their numerous prior dealings. Fox's intention when sending its June 5, 1968, purchase order was undoubtedly to make an offer which conformed to its past pattern of business with Baumgold. Baumgold's document, therefore, did not materially alter the parties' contractual intent under 2–207(2)(b) and stands as the integrating document of this transaction.

7. Both prior course of dealing and usage of trade were used to supplement the terms of the document to arrive at the conclusion that the form represents a sale or return contract. Section 2–326(4) provides that "[a]ny 'or return' term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this Article [R.C. 1302.04] (Section 2–201) and as contradicting the sale aspect of the contract within the provisions of this Article on parole or extrinsic evidence [R.C. 1302.05] Section 2–202)."

The statute of frauds does not bar the return aspect of the contract. The document containing the provision was not signed by the party charged in this action as required by 2–201(1),[7] nor was the document received by Fox so as to come within the merchant exception of 2–201(2).[8] However, since the stat-

---

5. UCC 2–207(2)(a) and (c) also do not apply to these circumstances because under subsection (a) Fox's offer did not limit acceptance to its terms and under subsection (c) Fox did not give notification of his objection. As to the latter point, although Fox never received notice of the terms of the form in this transaction, it was nevertheless fully apprised of the form by its prior dealings with Baumgold. Even if the form were rejected on this ground, the outcome of the suit would be the same. The form would still indicate the parties' contractual intent because of its use in their prior course of dealing.

6. Course of dealing is defined in R.C. § 1301.11(A), UCC § 1–205(1) as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

7. R.C. § 1302.04(A), UCC § 2–201(1) provides: "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. . . ."

8. R.C. § 1302.04(B), UCC § 2–201(2) provides: "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received."

ute of frauds has not been raised as a defense and the parties have admitted in their testimony that a right of return was intended, the statute of frauds has been waived. The return element is part of the contract by operation of 2–201(3)(b).[9]

As indicated previously, 2–326(4) specifies that a return provision is not permitted to contradict the sale aspect of a contract under the Code's parole evidence rule.[10] The rule provides, however, that course of dealing and usage of trade may be used to explain or supplement the terms of an integrated contract.[11]

8. Fox did not specify the shipment terms in its offer. Under R.C. § 1302.24(B), UCC § 2–311(2), "[u]nless otherwise agreed . . . specifications or arrangements relating to shipment are at the seller's option." Here, Baumgold chose to tender delivery at a particular destination, Fox's business establishment.

■ The Code expresses a clear preference for shipment contracts which require the seller to tender delivery to a carrier, rather than at the eventual destination of the goods.[12] R.C. § 1302.47, UCC § 2–503, Comment 5 states that:

"Under this Article the 'shipment' contract is regarded as the normal one and the 'destination' contract is the variant type. The seller is not obligated to deliver at a named destination and bear the concurrent risk of loss until arrival, unless he has specifically agreed so to deliver or the commercial understanding of the terms used by the parties contemplates such delivery."

In this transaction, Baumgold chose to ship the diamonds by registered mail. By doing so, the seller wanted to assure both the safe handling of the goods and that the diamonds were delivered into the buyer's hands. The merchandise was insured by the United States in favor of Baumgold to cover risks occurring during transmission. In addition, commercial insurance covered all of the seller's shipments of jewelry.

■ The contract states that "[t]he merchandise . . . is delivered to you on memorandum only, at your risk from all hazards . . . upon the express condition that all such merchandise . . . shall be returned on demand, in full, in its original form." This language is ambiguous. The risk specified in the contract can be read to modify either "is delivered" or "memorandum." By construing the language so that both the risk provision and the condition of return modify "memorandum," the words serve to properly define the term as it is used in the trade. The parties' understanding that they intended a sale or return contract is effectuated, for this construction is consistent with the Code's allocation of risk of loss to the buyer during the return of the goods.[13]

■ This interpretation leaves the following as a separate contractual term: "[t]he merchandise . . . is delivered to you. . . ." The term constitutes an affirmative representation that delivery would be at the buy-

---

9. R.C. § 1302.04(C)(2), UCC § 2–201(3)(b) provides: "A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . . (b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted."

10. R.C. § 1302.05, UCC § 2–202.

11. The rule specifies that: "Terms . . . intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented (a) by course of dealing or usage of trade . . . or by course of performance. . . ."

12. R.C. § 1302.48(A), UCC § 2–504(1).

13. R.C. § 1302.40(B)(2), UCC § 2–327(2)(b) specifies that "(2) [u]nder a sale or return unless otherwise agreed . . . (b) the return is at the buyer's risk and expense."

er's place of business. Baumgold's intent to deliver at a particular destination as shown by its insurance coverage and use of registered mail, reinforces this construction. The contract is thus properly designated a destination contract.[14]

9. Plaintiffs argue that there is a strong presumption that a postal shipment is received by the addressee when there is proof that the package was correctly addressed and delivered to the post office. The courts have long recognized both the existence of this presumption and that it can be rebutted by direct evidence of non-receipt. Hagner v. United States, 285 U.S. 427, 430–431, 52 S.Ct. 417, 76 L.Ed. 861 (1932); Dunlop v. United States, 165 U.S. 486, 495, 17 S.Ct. 375, 41 L.Ed. 799 (1897); Schutz v. Jordan, 141 U.S. 213, 219–220, 11 S.Ct. 906, 35 L.Ed. 705 (1891); Charlson Realty Co. v. United States, 384 F.2d 434, 442, 181 Ct.Cl. 262 (1967); Central Paper Co. v. C.I.R., 199 F.2d 902, 904 (6th Cir. 1953). Moreover, postal employees are presumed to properly discharge their duties. Henderson v. Carbondale Coal & Coke Co., 140 U.S. 25, 37, 11 S.Ct. 691, 35 L.Ed. 332 (1891); Boerner v. United States, 117 F.2d 387, 390 (2d Cir. 1941), cert. den., 313 U.S. 587, 61 S.Ct. 1120, 85 L.Ed. 1542 (1941).

■ There is proof in this case that the package was properly addressed and posted. However, the proven irregularities involving the attempted delivery of the diamonds, the act of procuring a signed receipt five days after the initial delivery attempt, and the testimony showing that the package was not received are clearly enough to rebut the presumptions of receipt and proper handling.

10. The seller's delivery obligations in a destination contract are set forth in R.C. § 1302.47, UCC § 2–503. The statute provides in relevant part that:

(1) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this Article, and in particular

(a) tender must be at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable the buyer to take possession;

.    .    .    .    .    .

(3) Where the seller is required to deliver at a particular destination tender requires that he comply with subsection (1).  .   .   .

The agreement of the parties was that delivery would be made to Fox. Since no delivery occurred, Baumgold did not perform its tender obligations and is in breach of the contract.

■ 11. When a contract is so breached, the risk of loss remains with the seller. Under R.C. § 1302.54(A), UCC § 2–510(1) "[w]here a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance." Baumgold has not attempted to cure under R.C. § 1302.52, UCC § 2–508, nor has Fox accepted a conforming selection of diamonds. The risk of loss, therefore, remains with Baumgold.

12. Fox did not bear the risk of loss and is, accordingly, not liable for the price of the diamonds. Neither is Fox

14. Plaintiffs argue that Sternheim v. Silver Bell of Roslyn, Inc., 66 Misc.2d 726, 321 N.Y.S.2d 965 (1971) is on point and is favorable to a finding of liability of defendant Fox. In *Sternheim*, however, the carrier had a contract with the defendant buyer to deliver goods to its place of business. The Court held that in this instance the seller's only obligation was to tender conforming goods to the buyer's carrier. The contract was held to be a shipment contract, resulting in the shifting of the risk of loss to the buyer upon the seller's tender to the carrier. These shipment arrangements clearly differ from those involved in the instant case.

liable for converting the merchandise since it never received the diamonds and did not appropriate them to its possession.

13. At all times relevant to this action, the Postmaster General was authorized by former 39 U.S.C. § 5001 [15] to maintain "a system of registration for the greater security of mail matter." This section provided a maximum of $1000.00 liability for loss or damage to a registered article. It further authorized the Postmaster General to indemnify a sender up to a maximum of $10,000.00 if there was no commercial insurance coverage of the article." [16]

14. Under former 39 U.S.C. § 5005, "[u]nless otherwise prescribed by the Postmaster General, the mailer shall declare the full value of registered mail . . . at the time of mailing. The Postmaster General may not pay a claim for indemnity if the value was knowingly and wilfully misstated." The applicable regulations provided that jewelry must be declared at its market value or cost. 39 CFR § 161.4(a)(1968). Baumgold declared, for postal registration purposes, that the diamonds had a value of $8000.00. Whereas, the value of the merchandise as shown on the All Risk Memorandum was $10,033.00. The $8000.00 declaration represents Baumgold's cost and fulfills the regulations requirements pertaining to declaration of value. Since there was no wilful understatement, 39 CFR § 164.3(b)(4) (1968) does not prohibit payment of Baumgold's claim.[17]

■ 15. The claim against the United States is not barred by Baumgold's failure to state in the Post Office claim form that the diamonds were commercially insured. The Government argues that this misrepresentation precludes plaintiffs' recovery in this action.

That the United States, as sovereign, incurs liability only as it consents to be sued is beyond question. In Twentier v. United States, 109 F.Supp. 406, 124 Ct. Cl. 244 (1953) the court held that

"[t]he United States is liable to the owners of lost or damaged mail only to the extent to which it has consented to be liable, and the extent of its liability is defined by the Postal Laws and Regulations. Public policy requires that the mails shall be carried subject to these regulations . . . and the liability of the Government in case of loss or damage is fixed by these regulations. . . . (Citations omitted).

See also Marine Ins. Co., Ltd. v. United States, 410 F.2d 764, 187 Ct.Cl. 621 (1969); Taylor v. United States Post Office Dept., 293 F.Supp. 422 (E.D.Mo. 1968); Ridgway Hatcheries, Inc. v. United States, 278 F.Supp. 441 (N.D. Ohio 1968); Nickola v. United States Post Office Dept., 137 F.Supp. 943 (E. D.Mich.1956), aff'd mem., 229 F.2d 737 (6th Cir. 1955), cert. denied, 351 U.S. 908, 76 S.Ct. 698, 100 L.Ed. 1443 (1956).

■ The United States has determined that it will be liable, when registered mail is lost, for a maximum of $10,000.00 or $1,000.00, depending on whether the sender commercially insured the article. The relevant conditions attached to indemnification in 1968 were contained in 39 CFR §§ 164.3 and 164.4. These regulations provided that a claim must be filed on post office forms, accompanied with evidence of insurance. 39 CFR § 164.4(e)(1) prescribed that evidence of insurance could be shown *inter alia* by the production of a receipt obtained at the time of mailing. In both *Taylor* and *Nickola, supra,* failure to comply with the requirements of showing post office insurance coverage was held to preclude governmental liabil-

---

15. In 1970, Congress amended and re-enacted Title 39 into positive law. 84 Stat. 719, 39 U.S.C. § 101 et seq.

16. At the time in question, postal regulations did limit indemnity to a maximum of $10,000.00 when the sender had no additional commercial insurance coverage. A $1000.00 maximum was prescribed in instances where commercial insurance was carried. 39 CFR § 161.2(b)(1) and (2) (1968).

17. This regulation states that a claim is non-payable when "[t]he sender failed to state at the time of mailing the full value of a registered article for the purpose of depriving the Postal Service of revenue."

ity. Baumgold's post office receipts fulfills this requirement.

Unlike the presentation of evidence of post office insurance, the showing of evidence of commercial insurance is not a prerequisite for indemnity. The claim form question regarding commercial insurance simply permits the Government to ascertain the maximum amount of its potential liability. Baumgold's innocent conduct should not be held to foreclose recovery, especially since there is no evidence that it was attempting to defraud the United States. The Court has found that commercial insurance covered the shipment of diamonds; therefore, plaintiffs' claim is limited to $1000.00.

16. Congress had provided that "[c]laims for indemnity involving registered mail . . which is also insured with another insuring agency shall be adjusted by the Postmaster General on a pro rata basis as a co-insurer with the other insuring agency." 39 U.S.C. § 5011. The then applicable regulations found in 30 CFR § 164.1(b) set forth the following formula to assess the liability of the post office:

$$\frac{\text{Postal insurance or actual value (whichever is less)}}{\text{Postal insurance or actual value (whichever is less) and total private insurance}}$$

X Actual value or cost of repairs = Postal liability."

Using the following figures: $1,000.00 representing the amount of postal insurance; $7,500.00 representing the total private insurance; and $8,000.00 as the actual value of the diamonds, the United States' liability totals $941.18. The United States is liable to the plaintiffs in this amount.

It is so ordered.