**In re IDE JEWELRY CO., INC., Debtor.**

**UNDERWRITERS AT LLOYDS, as subrogees of Bharat Diamond Corp., Plaintiff,**

v.

**Zachary SHIMER, Trustee for Ide Jewelry Co., Inc., Defendant.**

**Bankruptcy No. 86 B 10623.**

United States Bankruptcy Court, S.D. New York.

July 24, 1987.

Chadbourne & Parke, New York City, for trustee; David A. Vicinanzo, of counsel.

Brian Fishkin, New York City, for Underwriters at Lloyds, as Subrogees of Bharat Diamond Corp.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

On October 3, 1986, the interim trustee (the "Trustee" or "Defendant") filed a motion seeking an order requiring Rodney Lissenden, as representative underwriter for and on behalf of Underwriters at Lloyds subscribing to policy of insurance No. JB750600978 ("Ide's Insurer"), to turn over the proceeds from a loss of property occurring on December 26, 1985, which was covered by the jewelers block policy issued to Ide Jewelry Co., Inc. ("Ide" or the "Debtor"). An affidavit in partial opposition to the interim trustee's motion was filed on behalf of Underwriters at Lloyds subscribing to policy of insurance No. JB244145100 ("Plaintiff") on October 15, 1986. Plaintiff made a payment of $35,000 to Bharat Diamond Corp. ("Bharat"), pursuant to the insurance policy it issued to Bharat, for diamonds stolen from Ide while on consignment from Bharat. Thus, plaintiff partially opposed the turnover motion based on its assertion that $35,000 of the proceeds should be turned over directly to it on the ground that it is allegedly a direct beneficiary of Ide's insurance policy.

At the hearing held on October 21, 1986, this Court directed that the underwriters insuring Ide interplead the net policy proceeds of $140,296.00 by delivery of that amount to the interim trustee and that the affidavit in partial opposition to the interim trustee's turnover motion would be deemed an adversary proceeding complaint which is denied by the other creditors and the interim trustee. A stipulation of facts was filed on February 24, 1987 and a trial on these stipulated facts was held on April 27, 1987.

## I.

Bharat is a New York corporation which operates as a wholesaler of polished diamonds. Between December 9, 1985 and December 23, 1985, Bharat consigned to Ide more than 171 carats of loose diamonds pursuant to the terms and conditions of three separate jewelers memoranda. The memoranda provide:

> The merchandise described below is delivered to you on memorandum, at your risk from all hazards, regardless of the cause of the loss or damage, only for examination and inspection by prospective purchasers, upon the express condition that all such merchandise shall remain the property of BHARAT DIAMOND CORP. and shall be returned on demand, in full in its original form. Until the merchandise is returned and actually received by us, you are fully responsible therefor, and in the event of damage or loss, whether caused by you or by another, whether or not under your control, you will indemnify us immediately by payment of the stated value which represents the extent of the actual loss and is not intended to constitute a price for the sale of the merchandise. You acquire no right or authority to sell, pledge, hypothecate or otherwise dispose of the merchandise, or any part thereof, by memorandum or otherwise, it being expressly understood that regardless of other transactions or prior trade customs, no credit is extended with respect to this merchandise. A sale of all or any portion of the merchandise shall occur only if and when we agree and you shall have received from us a separate invoice. A subsequent sale of any specific part of the merchandise, shall not affect the terms hereof with respect to the balance hereof. Receipt of the merchandise constitutes your agreement to the foregoing terms which represent the entire contract with respect to the merchandise herein described and which cannot be varied by oral statements, dealings with respect to other merchandise of [sic] any contrary custom of the trade. (This is NOT an Invoice or Bill of Sale).

Underneath the above printed terms, each memorandum contains a handwritten indication of the number of carats and the dollar amount per carat, followed by the words: "Payable in 60 days," "Payable 60 Days By Note" or "Terms Net 60 Days By Note."

On December 26, 1985, Ide agreed to sell a quantity of loose diamonds, including diamonds received from Bharat, to one Bogosian for approximately $293,000. The subject diamonds were thought to have been deposited in a cachet stored in Ide's safe awaiting Bogosian's return with the funds required to complete the sale. However, Bogosian never returned and when the cachet was opened a week later, it was discovered that he had switched the diamonds with packets of rice. Subsequently, on April 10, 1986, an involuntary petition was filed against the Debtor under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Code").

Plaintiff, having issued insurance coverage to Bharat for its goods entrusted to others in the trade in the amount of $40,000 less a $5,000 deductible, paid Bharat the sum of $35,000 for the loss of its goods. Plaintiff, as a subrogee of Bharat, now seeks to recover, as an insured under Ide's insurance coverage, $35,000 from the proceeds of the jewelers block policy issued by Ide's Insurer ("Ide's Policy" or the "Policy") which have already been deposited with the interim trustee.

Property insured by the Policy includes precious and semi-precious stones, *see* Policy ¶ 3(a), "delivered or entrusted to the Assured by others who are dealers in such property or otherwise engaged in the jewelry trade, but only to the extent of the Assured's own actual interest therein because of money actually advanced thereon, or legal liability for loss or damage thereto." Policy ¶ 3(c). Paragraph 10 of the Policy further provides:

> In the event of loss of or damage to property of others held by the Assured for which claim is made upon the Underwriters, the right to adjust such loss or damage with the owner or owners of the property is reserved to the Underwriters and the receipt of such owner or owners in satisfaction thereof shall be in full satisfaction of any claim of the Assured for which such payment has been made. If legal proceedings be taken to enforce a claim against the Assured as respects any such loss or damage, the Underwriters reserve the right, at their option, without expense to the Assured, to conduct and control the defence on behalf of and in the name of the Assured. No action of the Underwriters in such regard shall increase the liability of the Underwriters under this Policy, nor increase the limits of liability specified in the Policy.

Policy ¶ 10.

Plaintiff concedes that the transaction between Bharat and Ide may be deemed a sale or return transaction under the Uniform Commercial Code (the "U.C.C.") but asserts that it is nevertheless entitled to recover the sum it paid to Bharat because it is subrogated to Bharat's right to bring a direct action against Ide's Insurer (Tr. 4/27/87 at 4). Defendant argues: (i) the transaction between Bharat and Ide must be treated as a "sale or return" under § 2–326 of the U.C.C. and thus the diamonds held by Ide and the proceeds from their loss are subject to the claims of Ide's creditors, including its trustee in bankruptcy, (ii) the Policy gave no party, other than the Debtor, a right of direct action against Ide's Insurer, (iii) even were Ide's Insurer subject to direct actions brought by parties other than the Debtor, only owners of goods in the Debtor's possession would have such an action, and Bharat was not an owner of the goods after it transferred them to the Debtor, and (iv) if Bharat had a right of direct action against Ide's Insurer, it was subsequently waived upon the failure of Bharat and its subrogee to bring the action during either the approximate 3½ months between the loss and the filing of the petition in bankruptcy or during the approximate 9½ months between the loss and the filing of Plaintiff's affidavit in partial opposition to the interim trustee's motion. *See* Respondent's Brief in Opposition at 2–3; Respondent's Supplemental Brief in Opposition at 1–2, 6.

## II.

We turn first to Defendant's argument under § 2–326 of the U.C.C. That section provides, in pertinent part:

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

(a) a "sale on approval" if the goods are delivered primarily for use, and

(b) a "sale or return" if the goods are delivered primarily for resale.

. . . .

(3) where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then *with respect to claims of creditors* of the person conducting the business the goods are *deemed* to be on sale or return. *The provisions of this subsection are applicable even though an agreement purports to reserve title* to the person making delivery until payment or resale *or uses such words as "on consignment" or "on memorandum".* However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Article on Secured Transactions (Article 9).

N.Y. U.C.C. § 2–326 (McKinney 1964) (emphasis added).

Traditionally, a distinction has been drawn between "contracts of sale or return" and sales on "consignment" or "memorandum." *See Ginsberg v. Martin,* 122 Misc. 468, 468–69, 203 N.Y.S. 110, 111 (1st Dep't 1924). A "sale or return" involves "a delivery to a proposed purchaser, with an option in the purchaser to return the goods and thus revest title in the seller...." *Ibid.* By contrast, in "sales on

memorandum" and "consignment sales" the purchaser has an option "to take title upon certain conditions" and "title does not pass until the option is exercised, and in the meantime the title and the right to immediate possession remain in the seller." *Id.* at 469, 203 N.Y.S. at 111. While, "[h]istorically, the consignment contract has been denominated as a 'sale,' regarded as 'security,' and treated as a 'bailment' or 'agency,'" "the term 'consignment sale' is a misnomer, since the efficacy of a consignment depends on a finding that no sale has been made." *Columbia International Corp. v. Kempler,* 46 Wis.2d 550, 175 N.W.2d 465, 468, 7 U.C.C. Rep.Serv. (Callaghan) 650, 655 (1970) (citing Hawkland, *Consignments Under the Uniform Commercial Code: Sales or Security?,* Uniform Commercial Code Co-Ordinator Annotated 395 (1963)).

Under the U.C.C., two types of consignments are treated as sale or return transactions. First, where consignments are "intended as security", any reservation of title by the person making delivery is "limited in effect to a reservation of a security interest", N.Y. U.C.C. § 2–401(1) (McKinney 1964); *see id.* §§ 1–201(37), 9–102(2) (McKinney Supp.1987); *Mann v. Clark Oil & Refining Corp.,* 302 F.Supp. 1376, 1380, 6 U.C.C. Rep.Serv. (Callaghan) 1253, 1257–58 (E.D.Mo.1969), *aff'd,* 425 F.2d 736, 7 U.C.C. Rep.Serv. (Callaghan) 695 (8th Cir. 1970); *Nauman v. First National Bank of Allen Park,* 50 Mich.App. 41, 212 N.W.2d 760, 761, 13 U.C.C. Rep.Serv. (Callaghan) 1191, 1193 (1973), and, therefore, such a contract is a "contract for sale", *see* N.Y. U.C.C. § 2–106(1) (McKinney 1964), and the parties to the contract are buyer, *see id.* § 2–103(1)(a) (McKinney 1964), and seller, *see id.* § 2–103(1)(d). *Cf. Columbia International Corp. v. Kempler,* 175 N.W.2d at 468, 7 U.C.C. Rep.Serv. (Callaghan) at 654. Thus, where a consignment is intended as security and the goods are delivered to the consignee primarily for resale, the transaction will actually be a sale or return pursuant to § 2–326(1)(b) of the Code, N.Y. U.C.C. § 2–326(1)(b) (McKinney 1964), and the goods will be subject to the claims of

the buyer's creditors while the goods are in its possession, *see id.* § 2–326(2), unless it perfects its "security interest" as required by Article 9 of the U.C.C., *see id.* § 9–203(1) (McKinney Supp.1987). *See Mann*, 302 F.Supp. at 1380, 6 U.C.C. Rep.Serv. (Callaghan) at 1258; *Nauman*, 212 N.W.2d at 762, 13 U.C.C. Rep.Serv. (Callaghan) at 1194.

Second, where consignments are not intended as security ("true consignments" or "price-fixing consignments"), they may, under certain circumstances and with respect to certain parties, be "deemed" to be sale or return transactions, even though the transaction is "not a sale with title passing to the buyer," *Manger v. Davis*, 619 P.2d 687, 692, 30 U.C.C. Rep.Serv. (Callaghan) 515, 522 (Utah 1980). *See* N.Y. U.C.C. § 2–326(3) (McKinney 1964). Where goods are delivered to a consignee for sale and the consignee "maintains a place of business at which he deals in goods of the kind involved, under a name other than" that of the consignor, "then *with respect to claims of creditors of*" the consignee "the goods are deemed to be on *sale or return*," *id.* § 2–326(3) (emphasis added), "*unless* the consignor has taken one of the three enumerated protecting steps." *Columbia International Corp. v. Kempler*, 175 N.W.2d at 469, 7 U.C.C. Rep.Serv. (Callaghan) at 657 (emphasis added); *see, e.g.,* N.Y. U.C.C. § 2–326(3)(a)-(c) (McKinney 1964). A consignor may protect himself from having his delivery of goods deemed to be on sale or return by: (i) complying with the filing provisions of Article 9 of the U.C.C., *id.* § 2–326(3)(c), (ii) dealing with a consignee who "is generally known by his creditors to be substantially engaged in selling the goods of others," *id.* § 2–326(3)(b), or (iii) posting a sign in compliance with applicable law providing for a consignor's interest, *id.* § 2–326(3)(a). True consignments not governed by § 2–326 may still be subject to the provisions of § 2–403(2), (3) of the U.C.C. *See id.* § 2–403(2), (3); *Lipschutz v. Gordon Jewelry Corp.*, 373 F.Supp. 375, 392 (S.D.Tex.1974); *Nauman*, 212 N.W.2d at 762, 13 U.C.C. Rep.Serv. (Callaghan) at 1194; *Manger*, 619 P.2d at 692, 30 U.C.C. Rep.Serv. (Callaghan) at 522. To the ex-

tent they are not "displaced by any particular provision of the" U.C.C., true consignments are "governed by the principles of agency." *Manger*, 619 P.2d at 692, 30 U.C.C. Rep.Serv. (Callaghan) at 521; *see* N.Y. U.C.C. § 1–103 (McKinney 1964).

■ The principal consequence of all this is that goods held on sale or return or deemed to be held on sale or return "are subject to [the claims of the buyer's creditors] while in the buyer's possession." N.Y. U.C.C. § 2–326(2) (McKinney 1964). This is of significance here, for at the hearing, Plaintiff's attorney stated that Plaintiff did not dispute Defendant's characterization of the transaction between Bharat and Ide "as a sale or return" (Tr. 4/27/87 at 4). Therefore, Defendant asserts that the diamonds were subject to its claim since the U.C.C.'s definition of creditor includes "any representative of creditors, including ... a trustee in bankruptcy." N.Y. U.C.C. § 1–201(12) (McKinney 1964).

Although § 2–326 "was intended to cover a situation where the possession and offering for sale of another's merchandise presumably led to extensions of credit in the belief that the merchandise was owned by the possessor," *In re Mincow Bag Co.*, 53 Misc.2d 599, 601, 279 N.Y.S.2d 306, 308, 4 U.C.C. Rep.Serv. (Callaghan) 197, 199 (Special Term 1967), *aff'd*, 29 A.D.2d 400, 288 N.Y.S.2d 364, 5 U.C.C. Rep.Serv. (Callaghan) 60 (1st Dep't 1968), *aff'd*, 24 N.Y.2d 776, 248 N.E.2d 26, 300 N.Y.S.2d 115, 6 U.C.C. Rep.Serv. (Callaghan) 112 (1969), it clearly requires that goods held on sale or return must be in the buyer's possession at the time the buyer's creditors assert their claims, in order for those goods to be subject to their claims. *See* N.Y. U.C.C. § 2–326(2) (McKinney 1964); *Mincow*, 53 Misc.2d at 601, 279 N.Y.S.2d at 308, 4 U.C.C. Rep.Serv. (Callaghan) at 199 (consignee "never had physical possession of the goods, and until a sale was effected had no interest against which the consignor had to secure itself" and the "unwary could not have been led into becoming creditors of [the consignee] based on any ostensible ownership of the merchandise"); *Nauman*, 212 N.W.2d at 762, 13 U.C.C.

Rep.Serv. (Callaghan) at 1195 ("We anticipate no need to consider the provisions of [§ 2–326].... The controversy arose when the goods were no longer in Grate's possession"). Here, no evidence has been introduced to indicate that any party obtained a claim superior to Bharat's while the diamonds were in Ide's possession. The Trustee's lien under § 544 of the Code arose after the loss of the diamonds. Thus, the Trustee is unable to avail himself of the protections provided for in § 2–326.

■ Apparently recognizing this deficiency in his position, the Trustee further argues that the insurance proceeds should be subject to the claims of creditors because insurance is a characteristic of ownership of the goods, and creditors might reasonably expect that an owner of goods has protected them by means of insurance. This assertion is without merit. Section § 2–326(2) only applies when the goods, not the existence of a claim to insurance proceeds, are in the buyer's possession. The New York Court of Appeals has rejected an argument, similar to that of Defendant, that a literal reading of § 2–326 of the U.C.C. would "frustrate its purpose" of protecting "general creditors from hidden priority interest[s] of consignors...." *See In re Mincow Bag Co.*, 24 N.Y.2d 776, 248 N.E.2d 26, 27, 300 N.Y.S.2d 115, 115–16, 6 U.C.C. Rep.Serv. (Callaghan) 112 (1969). While the U.C.C. grants substantial rights to creditors, they are not without limit, as explained above.

This reasoning, however, is not dispositive of this case. It remains to be determined whether Plaintiff can recover under the terms of Ide's insurance policy.

### III.

Absent a right of direct action against Ide's Insurer, Plaintiff may only look to the Debtor to recover damages for the loss of its subrogor's goods. It is clear that the Debtor is liable, either under the jewelers memoranda or under the U.C.C.'s risk of loss provisions, to Plaintiff, as Bharat's subrogee, for the loss of Bharat's diamonds while they were in its possession. *See* N.Y. U.C.C. § 2–327(2)(b), 2–509 (McKinney

1964); *Lipschutz v. Gordon Jewelry Corp.*, 373 F.Supp. 375 (S.D.Tex.1974); *Baumgold Brothers, Inc. v. Allan M. Fox Co., East*, 375 F.Supp. 807, 814, 14 U.C.C. Rep.Serv. (Callaghan) 580, 590–91 (N.D. Ohio 1973); *Harold Klein & Co. v. Lopardo*, 113 N.H. 400, 308 A.2d 538, 539–40, 13 U.C.C. Rep. Serv. (Callaghan) 252, 253–54 (1973); *Sternheim v. Silver Bell of Roslyn, Inc.*, 66 Misc.2d 726, 728, 321 N.Y.S.2d 965, 967–68, 9 U.C.C. Rep.Serv. (Callaghan) 465, 467 (N.Y. City Ct.1971). Since that liability arose pre-petition and any collateral which may have secured its claim is no longer held by the Debtor, Plaintiff only stands to recover from the Debtor's estate as a general creditor. However, if Plaintiff has a direct action against Ide's Insurer, then Plaintiff is entitled to recover from it, and thus the Trustee as escrowee, pursuant to the terms of the Policy regardless of the Debtor's pending bankruptcy proceeding.

### A. *Right of Direct Action*

In support of the Plaintiff's assertion that it has the right of direct action against Ide's Insurer based on the language contained in paragraphs 3 and 10 of the Policy, it relies on *CBF Trading Co. v. Hanover Insurance Co.*, 603 F.Supp. 685 (S.D.N.Y. 1984). There, the district court held, pursuant to the terms of a jewelers block insurance policy containing paragraphs virtually identical to paragraphs 3 and 10 of the Policy issued to Ide, "the insurer intended to provide the right of direct action by owners of property held in trust by the insured." *Id.* at 688. In reaching that conclusion, Chief Judge Motley noted that "[a]s a general rule, there is no privity between an injured party and the insurer of the wrongdoer, and the injured party has no right of direct action against the insurer," but she pointed out that "[e]xceptions to this general rule exist where direct action is authorized by statute ... or a contractual provision in an insurance policy issued to a bailee." *Id.* at 687 (citations omitted). Accordingly, the court found that direct action was authorized pursuant to the terms of an insurance policy because paragraph 10 of that insurance contract made it clear that the insurer "understood

that it was insuring the bailee of goods and that the terms of the policy covered not only goods owned by the insured but also property held by him in trust," and it specifically provided that any loss could "be adjusted by defendant with either the insured or the owner of the property." *Id.* at 688.

Application of the reasoning set forth in *CBF Trading* reveals that the terms of the Policy issued by Ide's Insurer indicate that it "intended to provide the right of direct action by owners of property held in trust by the insured." *Ibid.* This is so despite Defendant's assertion that the following language of ¶ 10 negates a finding of such intent: "If legal proceedings be taken to enforce a claim against the Assured as respects any such loss or damage, the Underwriters reserve the right, at their option, without expense to the Assured, to conduct and control the defense on behalf of and in the name of the Assured." That language enables Ide's Insurer to conduct and control Ide's defense in those situations where legal proceedings are brought against Ide. It does not, however, negate the notion that action may be brought directly against Ide's Insurer. Where legal proceedings are brought directly against Ide's Insurer, it may, of course, conduct and control its own defense without the need for any contractual provision authorizing it to do so. Thus, it is clear that an owner of property held in trust by Ide possesses a right of direct action against Ide's Insurer for its loss.

### B. *Ownership of Bailed Diamonds*

Thus the principal question here is whether Bharat was the owner of the diamonds at the time they were stolen.

To be sure, the U.C.C. "rejects not only the use of 'title' as a problem-solver but the still more fundamental concept that any one idea, *i.e.,* 'title,' can serve as a routinely effective device for the solution of a wide variety of sales problems." T. Quinn, *Uniform Commercial Code Commentary and Law Digest* ¶ 2–401[A][1], at 2–249 (1978). Nevertheless, the concept retains importance in solving problems arising under other statutes or contractual agreements, *see id.* ¶ 2–401[A][2], at 2–250. Moreover, "the definition of a 'sale,' which is crucial to the issue of which transactions are covered by Article 2, turns on 'title'...." *Id.* ¶ 2–401[A][1], at 2–250; *see* N.Y.U.C.C. § 2–106(1) (McKinney 1964) ("A 'sale' consists in the passing of title from the seller to the buyer for a price (Section 2–401)"). Consequently, § 2–401 of the U.C.C. provides certain rules for the passage of title pursuant to a contract for sale. *See* N.Y. U.C.C. § 2–401 (McKinney 1964).

As observed above, a true consignment does not effect a sale and thus those provisions of Article 2 of the U.C.C. relating to "buyers" and "sellers" do not apply to true consignments. *See* N.Y. U.C.C. § 2–103(1)(a), (d) (McKinney 1964); *cf. Columbia International Corp. v. Kempler,* 175 N.W.2d at 468, 7 U.C.C. Rep.Serv. (Callaghan) at 654. Consequently, § 2–401(1)'s provision that "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest," N.Y. U.C.C. § 2–401(1) (McKinney 1964), does not apply to true consignments.[1] *See id.* § 1–201(37) (McKinney Supp.1987). Section 1–201(37)

---

1. While Ide would not hold title if it received the diamonds pursuant to a true consignment, it would, under certain circumstances, have the power to transfer good title to a purchaser. *See* N.Y. U.C.C. § 2–403(2), (3) (McKinney 1964); *Lipschutz,* 373 F.Supp. at 392; *Nauman,* 212 N.W.2d at 762, 13 U.C.C. Rep.Serv. (Callaghan) at 1194; *Manger,* 619 P.2d at 692, 30 U.C.C. Rep.Serv. (Callaghan) at 522. Section 2–403 provides, in pertinent part:

   (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the

entruster to a buyer in ordinary course of business.

   (3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

N.Y. U.C.C. § 2–403(2), (3) (McKinney 1964). The theft of the diamonds here did not transfer Bharat's title since the person taking the dia-

makes clear that "[u]nless a ... consignment is intended as security, reservation of title thereunder is not a security interest...." *Id.* Therefore, Bharat retained title to the diamonds if the transaction were a true consignment. *See id.* On the other hand, if the consignment were intended as security, Bharat's reservation of title is limited to a security interest, and Ide held title to the diamonds at the time of their loss. *See id.* § 2–401(1) (McKinney 1964); *White Motor Corp. v. Bronx-Westchester White Trucks, Inc.,* 18 U.C.C. Rep. Serv. (Callaghan) 382, 383 (N.Y. Special Term 1975) ("Reservation of title for security purposes does not prevent passage of title"). Accordingly, in order to determine whether Plaintiff stands in the shoes of an owner who is entitled to bring a direct action against Ide's Insurer, it must be determined whether the transaction between Bharat and Ide was a true consignment or a consignment intended as security.[2]

Whether a consignment is intended as security depends on the intent of the parties at the time they entered into the consignment arrangement. *See NYNEX BISC v. Beker Industries Corp. (In re Beker Industries Corp.),* 69 B.R. 937, 939, 3 U.C.C. Rep.Serv.2d (Callaghan) 1105 (Bankr.S.D.N.Y.1987). Such intent is to be determined by an objective standard which takes into account the economic realities of the transaction rather than the subjective intent of the parties. *See Liona Corp., N.V. v. PCH Associates (In re PCH Associates),* 804 F.2d 193, 199 (2d Cir.1986); *Steele v. Gebetsberger (In re Fashion Optical, Ltd.),* 653 F.2d 1385, 1390, 31 U.C.C.

Rep.Serv. (Callaghan) 1448, 1455 (10th Cir. 1981); *Beker,* 69 B.R. at 939; *Michigan Carbonic Co. v. Anton's Lounge & Restaurant (In re Anton's Lounge & Restaurant, Inc.),* 40 B.R. 134, 136, 39 U.C.C. Rep.Serv. (Callaghan) 647, 649 (Bankr. E.D. Mich.1984). Thus, "[t]o paraphrase Shakespeare's words, a secured transaction by any other name is still a secured transaction, and section 1–201(37) so recognizes." *Fashion Optical,* 653 F.2d at 1390, 31 U.C.C. Rep.Serv. (Callaghan) at 1455; *see Beker,* 69 B.R. at 939; *Anton's Lounge,* 40 B.R. at 136, 39 U.C.C. Rep.Serv. (Callaghan) at 649.

Perhaps the best way of determining the intention of the parties is to focus on the function of the consignment. *See Columbia International Corp. v. Kempler,* 175 N.W.2d at 470–71, 7 U.C.C. Rep.Serv. (Callaghan) at 658–59. Consignments function as secured transactions "where the goods go to the merchant who is unwilling to risk finding a market for the goods so the 'title' remains in the consignor...." *Id.* at 471, 7 U.C.C. Rep.Serv. (Callaghan) at 658; *Mann,* 302 F.Supp. at 1380, 6 U.C.C. Rep. Serv. (Callaghan) at 1258 ("[T]he actual purpose of [the consignor] in requiring [the consignee] to execute the Agreement was to make certain that [the Consignor] would be paid for the product delivered to [the consignee] out of the proceeds of the sale of gasoline. That is, [the consignor] wished to avoid the risks which would otherwise inhere in the transaction. In these circumstances, the reservation of title to the gasoline had no purpose other than to secure the payment for the gasoline which

---

monds was not a "buyer in the ordinary course of business," N.Y. U.C.C. § 1–201(9) (McKinney Supp.1987), because he was not in good faith and he did not buy the diamonds. *See id.*

2. The Defendant's citation of § 2–327 has no bearing on the issue of whether and when title passed. *See* N.Y. U.C.C. § 2–327 (McKinney 1964); *White Motor Corp. v. Bronx-Westchester White Trucks, Inc.,* 18 U.C.C. Rep.Serv. (Callaghan) 382, 383 (N.Y. Special Term 1975) (whether title had passed "is immaterial to the question of risk of loss, or defendant's liability for payment"). Section 2–327 provides that "[u]nder a sale or return unless otherwise agreed ... the return is at the buyer's risk and expense." *Id.*

§ 2–327(2). This section would not even apply in the case of a true consignment because, even were the transaction "deemed to be on sale or return" "with respect to claims of creditors of the person conducting the business", *see id.* § 2–326(3), it is not deemed to be on sale or return with respect to the parties to the consignment agreement. Moreover, § 2–327(2) only provides that the risk of loss, not title, shall pass to the buyer when it applies. By contrast, § 2–327(1) specifically provides that title does not pass to a buyer under a sale on approval until acceptance. *See* N.Y. U.C.C. § 2–327(1)(a) (McKinney 1964).

was delivered. Therefore, such reservation of title constituted a 'security interest.' ").

Facts which support the notion that a consignment was intended as security include: (i) setting of price by the consignee, *see In re Gross Mfg. & Importing Co.,* 328 F.Supp. 905, 913, 9 U.C.C. Rep.Serv. (Callaghan) 355, 366 (D.N.J.1971); *In re De'Cor Wallcovering Studios, Inc.,* 8 U.C.C. Rep. Serv. (Callaghan) 59, 60 (E.D.Wis.1970); *Columbia International Corp. v. Kempler,* 175 N.W.2d at 471, 7 U.C.C. Rep.Serv. (Callaghan) at 659, (ii) billing consignee upon shipment, *Gross Mfg.,* 328 F.Supp. at 913, 9 U.C.C. Rep.Serv. (Callaghan) at 366, (iii) commingling of proceeds and failure to keep proper accounts by the consignee, (iv) "mixing consigned goods with goods owned," *id.,* and (v) consignor purporting to retain title to goods until paid, *Sommers v. International Business Machines,* 640 F.2d 686, 689, 30 U.C.C. Rep.Serv. (Callaghan) 1757, 1760 (5th Cir.1981).

Conversely, the following facts indicate that a transaction was not intended as security and that it constitutes a true consignment: (i) consignor retained control over price, *see Columbia International Corp. v. Kempler,* 175 N.W.2d at 471, 7 U.C.C. Rep.Serv. (Callaghan) at 659, (ii) consignee "was given possession with authority to sell only upon the express consent of [the consignor] as to the sale price," *Manger,* 619 P.2d at 692, 30 U.C.C. Rep. Serv. (Callaghan) at 522, (iii) consignor may recall the goods, *id.* at 691, 30 U.C.C. Rep. Serv. (Callaghan) at 521, (iv) consignee "was to receive a commission and not a profit on the sale," *id.* at 692, 30 U.C.C. Rep.Serv. (Callaghan) at 522, (v) consigned property was segregated from other property of the consignee, *In re Coleman Pipe, Inc.,* 40 B.R. 338, 342 (Bankr.N.D.Tex.1984) ("By keeping the pipe separate, the parties intended to give notice that this merchandise was distinct from all the other items in [the consignee's] possession"), (vi) consignor was entitled to inspect sales records and the physical inventory of the goods in the consignee's possession, *id.,* and (vii) consignee has " 'no obligation to pay for the goods unless they are sold,' " *Mincow,* 53 Misc.2d at 600, 279 N.Y.S.2d at 308 (quoting Professor Kripke's "Practice Commentary" to N.Y. U.C.C. § 9–102 (McKinney 1964)).

In analyzing whether the transaction between Bharat and Ide was intended as security, we look first to the terms of their agreement as embodied in the jewelers memoranda. The printed language indicates that the transaction may be a true consignment because it states: (i) the merchandise is delivered "only for examination and inspection by prospective purchasers," (ii) the merchandise is delivered "upon the express condition that all such merchandise shall remain the property of BHARAT DIAMOND CORP. and shall be returned on demand, in full in its original form," (iii) "You acquire no right or authority to sell, pledge, hypothecate or otherwise dispose of the merchandise, or any part thereof, by memorandum or otherwise, it being expressly understood that regardless of other transactions or prior trade customs no credit is extended with respect to this merchandise", and (iv) "A sale of all or any portion of the merchandise shall occur only if and when we agree and you shall have received from us a separate invoice."

On the other hand, the statement that delivery is "at your risk from all hazards, regardless of the cause of the loss or damage," indicates that the transaction may have been intended as security. *See Mincow,* 53 Misc.2d at 600, 279 N.Y.S.2d at 308. This, by itself, might not indicate that the transaction was intended as security, in light of the printed statement that "you will indemnify us immediately by payment of the stated value which represents the extent of the actual loss and is not intended to constitute a price for the sale of the merchandise." The handwritten additions to the bottom of the form, however, provide a dollar amount and a period in which payment is to be made (for example "Terms Net 60 Days By Note"). That language suggests that the dollar amount may actually be the price which the consignee is to pay and that the consignee might be compensated by profit rather than commission and that the transaction may constitute a credit arrangement. Thus, the jewelers memoranda are ambiguous on their face as to the intended function of the transaction.

Notwithstanding the ambiguity of the jewelers memoranda, it appears that the parties treated the arrangement as one of sale or return. Bharat's purpose in placing the uncut diamonds at Ide was for Ide's resale to its own customers. (Tr. 4/27/87 at 3–4). That being so, it appears that the transaction was truly a consignment intended as security. Ide apparently had the power to sell these diamonds without obtaining permission from Bharat (Tr. 4/27/87 at 3–4).[3] There is no indication that Bharat retained any control over the price Ide was to charge. Nor was any evidence advanced to indicate that Ide was to be paid a commission.

Thus, since Bharat had physically delivered the diamonds to Ide, title had passed to Ide. *See* N.Y. U.C.C. § 2–401(1), (2) (McKinney 1964). Bharat was not an owner of the diamonds and thus neither it nor its subrogee was entitled to bring a direct action against Ide's Insurer.[4] *See CBF Trading*, 603 F.Supp. at 688 ("Therefore, pursuant to the terms of the policy written by the insurer it is evident that the insurer intended to provide the right of direct action by *owners* of property held in trust by the insured." (emphasis added)). Here, Plaintiff cannot be considered to be the owner, and it accordingly has no right of direct action under the Policy.

### IV.

The foregoing constitutes this Court's findings of fact and conclusions of law.

SETTLE ORDER.

---

**3.** While no evidence of trade custom was introduced and this Court does not rely on any such custom in reaching its decision, it is worth noting that another court has found that "[w]hen an item or items of jewelry have been selected by a retain merchant and placed in its showcases for sale, it is customary in the trade that, notwithstanding the provisions of the memorandum ..., the retail merchant may sell any such item of consigned jewelry in the ordinary course of business without prior notice to the wholesale dealer." *Lipschutz v. Gordon Jewelry Corp.*, 373 F.Supp. 375, 381 (S.D.Tex.1974). Moreover, another court has found, in a case in which a similar jewelers all-risk memorandum was utilized, that "the understanding of the par-

ties as evidenced by the contract document and their prior course of dealing was to enter into a sale or return contract, defined by ... UCC 2–326(1)(b), as a 'transaction ... [where] the goods are delivered primarily for resale.'" *Baumgold Brothers, Inc. v. Allan M. Fox Co., East*, 375 F.Supp. 807, 813, 14 U.C.C. Rep.Serv. (Callaghan) 580, 588–89 (N.D. Ohio 1973).

**4.** Because we have determined that the Plaintiff did not possess the right to bring a direct action against Ide's Insurer, we need not address Defendant's alternative argument that Plaintiff waived any direct action it may have possessed.